[No. 40615.    En Banc.    April 9, 1970.]
THE STATE OF WASHINGTON, *Respondent*, v. VIRGIL RICHARD
LANE, *Appellant*.*

*Barokas, Beitz & Schaefer*, by *Larry L. Barokas*, for appellant (appointed counsel for appeal).

*Charles O. Carroll* and *Darrell E. Lee*, for respondent.

FINLEY, J.—Appellant Virgil Richard Lane was charged and convicted of the crime of armed robbery and with being an habitual criminal, the latter charge in part depending upon the validity of the robbery conviction.

The evidence showed that at gunpoint appellant Lane robbed a Seattle Safeway Store of over $1,200. By happenstance, one of the three eyewitnesses to the robbery recognized Lane several days later at a local hamburger drive-in. The eyewitness took the license number of the car Lane was driving, followed the car to an apartment house and then notified the police. Shortly thereafter, in the early morning hours of January 16, 1968, four members of the Seattle Police Force obtained a pass key and crashed the

*Reported in 467 P.2d 304.

apartment with drawn guns. What happened immediately thereafter poses the only issue in this appeal.

Lane and a woman were standing in the apartment living room when the officers entered, identified themselves, and told Lane he was under arrest. One officer handcuffed him while the officer in charge, Detective Nelson, commenced telling the accused his rights under *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966). Another officer interrupted, asking "Do you have the gun?" Officer Nelson later testified before the jury that appellant Lane replied "I don't have the gun. I wouldn't be dumb enough to have it here."[1] The jury subsequently found Lane guilty of armed robbery.

There was no pretrial hearing on the admissibility of Lane's exclamatory statement. Indeed, the use of the statement at trial appears to have been an afterthought on the part of the deputy prosecutor. The state had completed the case against Lane when the deputy prosecutor recalled Detective Nelson to the stand and asked him if the defendant made any statements at the time of arrest. The detective replied affirmatively and then recited the statement attributed to Lane.

Defendant argues that the factual situation herein is identical to that in *Orozco v. Texas,* 394 U.S. 324, 22 L. Ed. 2d 311, 89 S. Ct. 1095 (1969), and the decision in *Orozco* should have prevented the prosecutor's use of Lane's potentially incriminating statement. At first glance the factual situation seems quite similar, but close analysis indicates that the cases must be distinguished.

The *Orozco* decision was one of a series of post-*Miranda* cases decided by the United States Supreme Court. The case arose out of a fatal shooting in a cafe which was the result of a quarrel between the deceased and Orozco.

---

[1] The record is somewhat contradictory as to Lane's exact reply. During a subsequent hearing, out of the presence of the jury, Officer Nelson testified that the initial reply was "No, I have no weapon." The officer testified that the question was then repeated to the woman present, at which point "he [Lane] said—I can't say that that is his exact words, but he said something like, 'If I had a gun I wouldn't have it here,' or 'I'm not dumb enough to have it here.'"

Orozco left the scene and returned to his boardinghouse. Four policemen arrived at the boardinghouse at 4 a.m. that morning and were directed to Orozco's bedroom. At that point, in the language of the court:

> All four officers entered the bedroom and began to question petitioner. From the moment he gave his name, according to the testimony of one of the officers, petitioner was not free to go where he pleased but was "under arrest." The officers asked him if he had been to the El Farleto restaurant that night and when he answered "yes" he was asked if he owned a pistol. Petitioner admitted owning one. After being asked a second time where the pistol was located, he admitted that it was in the washing machine in a backroom of the boardinghouse. Ballistics tests indicated that the gun found in the washing machine was the gun that fired the fatal shot.

The court found that petitioner had been questioned about the gun and his presence at the scene of the shooting, that he was in custody at the time and did not receive the required Miranda information about his rights. The court concluded that the subsequent use of these admissions at trial was a "flat violation of the Self-Incrimination Clause of the Fifth Amendment as construed in Miranda."

■ There is no question but that both Lane and Orozco were in custody when they made statements in response to certain crucial questions asked by the arresting police officers. But, a number of factors distinguish the situation involved in *Orozco* from that in the instant case. Mr. Orozco was asked a series of questions apparently *designed to elicit incriminating information*. On the other hand, the question or questions asked of Lane were apparently for one reason only—the physical protection of the police. The police knew that Lane had an extensive past history of robbery and burglary; there is no indication that Orozco had any prior criminal record. Lane was awake, dressed, and accompanied by another person; Orozco was in bed alone.

The police had good reason to believe that Lane was armed and potentially dangerous even in the company of a

number of officers with drawn guns. Our case of *State v. Hayes,* 73 Wn.2d 568, 439 P.2d 978 (1968), describes the type of danger which may have been anticipated by the police. In *Hayes* the accused had been arrested, handcuffed, and was being led to a paddy wagon when he drew a concealed gun and fired at the officer.[2] The United States Supreme Court continues to recognize the safety of the police officer as an important factor which must be considered in determining the reasonableness of the officer's actions. *See Terry v. Ohio,* 392 U.S. 1, 24, 20 L. Ed. 2d 889, 908, 88 S. Ct. 1868, 1881 (1968).

> [I]t would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.

Although *Terry v. Ohio* involved a "stop and frisk" situation which was tested by the reasonableness standard of the Fourth Amendment, we believe the concern there expressed is equally applicable when the Fifth Amendment is involved. Accordingly, we hold that it is not a violation of either the letter or spirit of *Miranda* for police to ask questions which are strictly limited to protecting the immediate physical safety of the police themselves and which could not reasonably be delayed until after warnings are given. Although the issue was not raised, it should be noted that in *Orozco v. Texas* at least one question, asking about Orozco's whereabouts on the night before, was not related in any way to protecting the police. We believe that *Miranda* requires that a warning of rights be given as quickly as reasonably possible and that *interrogation* by the police

---

[2]This is not an isolated incident. The Uniform Crime Reports for 1968 reported that "[i]n 1968, the trend established in prior years continued in that more law enforcement officers met death by criminal action when attempting arrests than from any other cause." *See* Federal Bureau of Investigation, Uniform Crime Reports for the United States-1968, at 45. During the period 1960-1968, firearms were used in 96 per cent of police deaths. Of these deaths, the great majority were at the hands of individuals with prior criminal activity. *Supra* at 46, 48. *See also* Creamer & Robin, *Assaults on Police,* Police, March-April, 1968, at 82 for a summary of other reports on the physical danger faced by police in making arrests.

pertaining to guilt shall be delayed until after the Miranda requirements have been met.

■ A further question is whether the resulting statement made by Lane was admissible at trial. In passing we will say that as we see this matter the deputy prosecuting attorney (who was not counsel on appeal) needlessly jeopardized the state's case by introducing questionable evidence which added little or nothing to an already clear-cut case. Furthermore, unlike the police, the deputy prosecutor was well trained in the law and was not required, as the police were, to make a quick decision under difficult circumstances. However, in any event, just because the use of the statement constituted dubious trial tactics does not mean that this was prejudicial and reversible error.

We know of no rule, and we are disinclined to invent one, holding inadmissible an incriminating exclamation which occurred without any violation of the accused's constitutional or statutory rights. *See State v. Persinger,* 72 Wn.2d 561, 433 P.2d 867 (1967).

The judgment of the trial court is affirmed. It is so ordered.

HUNTER, C. J., WEAVER, ROSELLINI, HAMILTON, HALE, NEILL, and McGOVERN, JJ., concur.

May 22, 1970. Petition for rehearing denied.