THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOHN L. BROWN, Defendant-Appellant.

(No. 53853;

First District—November 5, 1970.

245

Gerald W. Getty, Public Defender, of Chicago, (Nunzio Tisci and James N. Gramenos, Assistant Public Defenders, of counsel,) for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Elmer C. Kissane and Arthur Belkind, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE SCHWARTZ delivered the opinion of the court:

John L. Brown was indicted for murder, found guilty by a jury and sentenced by the court to serve a term of 50 to 100 years in the Illinois State Penitentiary. On appeal he contends (1) that at a hearing on a motion to suppress evidence the court erred in not requiring the State to produce a witness and in not continuing the hearing; (2) that certain evidence should have been suppressed; (3) that the court should have given his tendered manslaughter instructions; and (4) that the sentence is unreasonable.

On April 19, 1967 at about 9:00 P.M. one Oliver Bardge, Junior, arrived at the apartment of Miss Priscilla Miles, a friend of defendant and the mother of his child. Defendant came to the apartment at about 11:00 P.M. with a friend known only as Charles. He talked with Miss Miles in the living room while Bardge, Charles and Miss Miles's mother and grandmother were in the kitchen. He asked her to marry him and she said no. Defendant told her that he had been standing in the hallway before entering the apartment and had heard Bardge talking to her. He asked her whether Bardge had asked her for a kiss and she said yes. Defendant told her he could kill Bardge. He went into the kitchen and asked Bardge why he had asked his girl for a kiss and Bardge replied that he had not. Defendant thereupon knocked him to the floor. Bardge

appeared to be strangling and defendant told Miss Miles to get a pillow which he put under Bardge's head. He asked Bardge about fifty dollars Bardge owed him and Bardge replied that he only had seven dollars. Defendant's friend Charles then gave the defendant a gun and defendant fired a wide shot through a window. Miss Miles and her mother left the kitchen, but her grandmother stayed, grappled with defendant and pleaded with him not to hurt Bardge. Defendant replied that he would not hurt him. Miss Miles came into the kitchen and asked her grandmother to leave the defendant alone. Her grandmother let him loose and the shot that killed Bardge was fired. The grandmother testified that she did not actually see defendant point a gun at the deceased because she was hysterical. She testified however that she heard the shot, saw the gun in the defendant's hand and saw blood coming from Bardge's head. During that time she was still in the kitchen with defendant. He told her he would turn himself in and left the apartment.

The police interviewed several of the witnesses at the scene of the killing and were told by Miss Miles that defendant had another girl friend named Jean Sutton. Two of the policemen who knew defendant went to his home and talked with his father. At about 1:00 A.M. on April 20, 1967 they went to Miss Sutton's second floor apartment and with her consent entered the apartment to look for defendant. Her younger brothers and sisters were present. The police told her that defendant had killed a man. They asked her if he had called and she said that he had and that he had told her he would call again in the morning. The police arranged with the telephone company to trace the call. They later returned to Miss Sutton's apartment and told her to ask the defendant certain questions. Defendant called at about 7:00 A.M. One officer put his ear to the telephone on which Miss Sutton was talking with the defendant and heard him tell her he was at a named hotel. The location of the call from defendant was confirmed by the telephone company.

The police went to the hotel and to the room from which defendant's call to Miss Sutton had been made. A woman answered the door and when asked who was in the room, replied that her baby and her borther-in-law John Brown were there. The police entered the room with weapons drawn and told Brown who was sitting on a bed that he was under arrest. They saw a clip with cartridges on top of a dresser and asked defendant where the gun was. He told them it was in a drawer of the dresser. The officers removed the gun and took Brown into custody. He was indicted, tried and convicted. We proceed to a consideration of the errors charged.

■■■ In Point One defendant contends that it was error not to con-

tinue the hearing on his motion to suppress evidence when it appeared that Miss Sutton could not be found at the address supplied by the State. He contends that the State deliberately withheld evidence of her whereabouts and he bases that conclusion on the fact that she appeared as a witness for the State at the trial which took place some five months after the hearing on the motion to suppress. The hearing on the motion to suppress was held on September 13, 1967 and the trial commenced on February 19, 1968. The fact that the State was able to locate the witness on the later date even though defendant could not find her five months earlier is not evidence of improper activity by the State. Miss Sutton was married sometime after the date of the crime and before the date of the trial. There is merit in the State's contention that one of the difficulties in locating her was her assumption of her husband's name. Moreover, any prejudice to the defendant was removed when at the trial of the case the court considered a motion to suppress Miss Sutton's testimony and conducted a hearing out of the presence of the jury. At that hearing Miss Sutton appeared and testified. That situation is not similar to the one before the court in *Brady v. Maryland* (1963), 373 U.S. 83, cited by defendant. In *Brady* the prosecution was shown to have actively withheld evidence favorable to defendant. We find no merit in defendant's Point One.

■■ In Point Two defendant argues that the motion to suppress should have been granted because the entry into the apartment of Miss Sutton's mother was improper, the listening on the telephone by the police officer was eavesdropping and that taking of defendant's gun was improper. While Miss Sutton did not invite the policemen to come upstairs to her second floor apartment, she testified that after they were there, she told them they could come in and look for defendant. She further told them that defendant had called her and would call her again in the morning. Indicative of her voluntary cooperation is the fact that she not only admitted the police into the apartment, but stayed there after they left and until they returned to wait for defendant's call.

■■ The evidence as to defendant's whereabouts obtained by the police officer while listening to the telephone conversation between Miss Sutton and defendant was not in violation of the eavesdropping statute. At the time of the trial the statute (Ill. Rev. Stat., ch. 38, pars. 14—2 and 14—5 (1965)) provided:

"A person commits eavesdropping when he:

(a) Uses an eavesdropping device to hear or record all or any part of any oral conversation without the consent of any party thereto
* * *

* * *

Any evidence obtained in violation of this Article is not admissible in any civil or criminal trial, or any administrative or legislative inquiry or proceeding, nor in any grand jury proceeding;  *  *  *"

The only "devices" used by the officer were his ear and the telephone on which the conversation was being conducted. A telephone is not a "device" banned by statute. *People v. 5948 West Diversey Ave. Second Floor Apt., Chicago*, 95 Ill.App.2d 479, 238 N.E.2d 229.

■■  Although not listed in defendant's Points and Authorities as required by Supreme Court Rule 341(e)(5) (Ill. Rev. Stat., ch. 110A, par. 341(e)(5) (1969)), we have considered his contention that the police did not give him warnings as required by *Miranda v. Arizona* (1966), 384 U.S. 436 when they demanded that he tell them where the gun was. In support of his contention defendant cites *Orozco v. Texas* (1969), 394 U.S. 324. In that case the defendant, without being given *Miranda* warnings and in response to questions by the police, admitted that he was at the scene of the crime and that the gun was hidden in a washing machine. At the trial a police officer testified to these *statements* and the Court held that admission of the statements in evidence violated the defendant's Fifth Amendment right against self-incrimination.

In the instant case defendant's statement that the gun was in the drawer was admitted in evidence only at the hearing on the motion to suppress evidence. At the trial the police officer merely stated that the gun was recovered and did not testify that defendant had told him where it was. Thus the jury did not know of defendant's statement when it found him guilty.

■■  In *Orozco* the Court did not reach the question of whether the gun itself, as distinguished from the defendant's statement about it, was admissible. Under the circumstances in the case before us it is clear that the police would have found the gun without having to ask defendant where it was. When they entered the room they saw the cartridges on the dresser which was only five feet from the bed on which defendant was sitting. The police knew defendant had killed a person and they were therefore warranted in taking measures to protect their safety. The dresser drawer was within the area of defendant's immediate control and it is possible that he could have gained possession of the weapon. The dresser was thus a proper object of a search pursuant to arrest under the dictates of *Chimel v. California* (1969), 395 U.S. 752. The mere fact that immediately upon entering the room the police asked defendant where the gun was does not bar evidence obtained from a reasonable search.

A similar issue was presented in *State v. Lane* (Wash., 1970), 467 P.2d 304. There the police entered the defendant's apartment and placed him

under arrest. As one officer was giving him the *Miranda* warnings, another interrupted and asked the defendant, "Do you have the gun?" At the trial the officer testified that the defendant replied, "I don't have the gun. I wouldn't be dumb enough to have it here." The court affirmed the conviction holding that it was not a violation of either the letter or the spirit of *Miranda* for the police to ask questions limited to their immediate physical safety. In the case before us the police were called to arrest a defendant who had shot and killed a man after knocking him down because he had asked defendant's girl for a kiss. To inquire where he had placed the gun was not a violation of the Fifth Amendment.

■■ Defendant's third point is that the court erred in refusing instructions on voluntary and involuntary manslaughter. An instruction on manslaughter should be given where there is evidence on which the jury could find the defendant guilty of that offense. (*People v. Canada*, 26 Ill.2d 491, 187 N.E.2d 243.) Such an instruction should not be given however where the evidence establishes beyond a reasonable doubt that the crime was murder. (*People v. Waldron*, 33 Ill.2d 261, 211 N.E.2d 367.) It is voluntary manslaughter if at the time of the killing the defendant was acting "under a sudden and intense passion resulting from serious provocation" by the deceased, serious provocation being "conduct sufficient to excite an intense passion in a reasonable person." (Ill. Rev. Stat., ch. 38, par. 9—2 (1965).) It is argued that defendant's passion was aroused after he heard the deceased ask Miss Miles for a kiss. After he heard the request for a kiss, he spent some ten minutes in the living room talking with Miss Miles. He then went into the kitchen, knocked the deceased down, asked Miss Miles to get a pillow which he put under the victim's head and then asked him about a debt that he (Bardge) owed defendant. Only then did defendant get a gun from his friend Charles and after struggling with Miss Miles's grandmother who sought to restrain him and telling her he would not harm the deceased, did he kill him. The evidence does not show that defendant acted under a sudden and intense passion.

■■ The court also acted properly in refusing defendant's tendered involuntary manslaughter instruction. That crime is defined as the reckless performance of such acts as are likely to cause death or great bodily harm. (Ill. Rev. Stat., ch. 38, par. 9—3 (1965).) The evidence shows that defendant did not perform the acts merely recklessly, but with a definite intent to kill Bardge.

■■ In Point Four defendant contends that the sentence of 50 to 100 years is unreasonable and too severe. At the hearing in aggravation and mitigation evidence was presented that defendant had the following record:

November 17, 1959, found guilty of armed robbery and sentenced to one to three years in the penitentiary. Discharged in May 1962.

October 1962, again charged with robbery and put on five years' probation.

November 1962, violation of probation. Sent back to the penitentiary to serve one to three years. Discharged in February 1965.

July 1965, picked up for shoplifting and sentenced to 30 days in the House of Correction.

January 1968, found guilty of burglary and sentenced to serve 12 to 20 years in the penitentiary.

Defendant will still be eligible for parole after serving 20 years less time credit for good behavior. (Ill. Rev. Stat., ch. 38, par. 123—2 (1969).) The sentence was reasonable.

We find no reversible error in this case and the judgment is affirmed.

Judgment affirmed.

DEMPSEY, P. J., and McNAMARA, J., concur.