STATE of Maine

v.

Edward HUDSON.

Supreme Judicial Court of Maine.

Sept. 6, 1974.

Thomas E. Delahanty, II, County Atty., Peter Garcia, Asst. County Atty., Auburn, for plaintiff.

Charles H. Abbott, Lendall L. Smith, Lewiston, for defendant.

Before · DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK and ARCHIBALD, JJ.

WEATHERBEE, Justice.

On June 19, 1973 a jury sitting in Androscoggin County found the Defendant guilty of an armed assault (17 M.R.S.A. § 201–A) committed against one Raymond Bouchard. From this conviction the Defendant Hudson has appealed to this Court. We deny his appeal.

The alleged assault took place shortly after lunch time on March 13, 1973 in Lewiston as Bouchard was leaving a pawn shop. Bouchard testified that the Defendant approached him and told him not to "squeal" on him in regard to a certain criminal matter. Then, he said, the Defendant pulled out a handgun, touched it to Bouchard's stomach, and said: "Look, I don't care, I'll shut you up right now." The Defendant then put away the revolver and left the scene.

Bouchard then went to his mother's home, reported the matter to the police and was told to come to the police station. He walked to the police station and gave a statement to the police there. A police officer testified that a radio call went out to him as the officer on the beat. The record shows only that this officer was told to "look for" the Defendant and that the Defendant was said to be carrying a gun. The officer then patrolled his entire beat looking for the Defendant and finally saw him entering the bar of a local hotel. He radioed for assistance and, when another officer responded, the two policemen entered the bar in time to see the Defendant going into the washroom. When the Defendant came out, the officers accosted him and a limited search and questioning took place which will be discussed later. The officers then found the gun in the washroom.

Another State's witness, Alfred Bolduc, testified that he had been with the Defendant on the afternoon of March 13. He stated that twice the Defendant gave him a loaded revolver but that Bolduc gave it back on each occasion after a short lapse of time. One of these transfers occurred when Hudson and Bolduc approached a police officer on the street. Bolduc also stated that Hudson placed the same gun behind a broom in the men's room of the hotel outside which the Defendant was later arrested for armed assault. The arrest took place in mid-afternoon of March 13, 1973.

The Defendant presented the testimony of two friends and his brother, two of whom said they observed Mr. Bouchard talking with the Defendant and that it appeared to have been a friendly conversation, and the third claimed to have seen Bouchard with the gun earlier that day.

The Defendant propounds four arguments on appeal, which we will consider in order.

*1. The admission into evidence of statements made by the Defendant to the police concerning the whereabouts of a gun*

First, the Defendant urges that the Justice below erred by admitting into evidence two statements uttered by the Defendant. The Defendant contends that his two responses to police questions about the exis-

tence of a gun were not admissible in court because he was not advised of his rights under Miranda v. Arizona.[1] The State suggests that *Miranda* does not apply because the Defendant was not in custody and was subjected only to a "stop and frisk" to protect the officers and possible bystanders.

Because no objection was raised at trial as to the admissibility of these statements,[2] we treat the issue under the "obvious error" standard of review. State v. McKeough, Me., 300 A.2d 755 (1973); State v. Collins, Me., 297 A.2d 620 (1972); M.R.Crim.P., Rule 52(b).

Our decision requires review of the familiar standards imposed upon policemen for the benefit of suspects in custody under *Miranda*. That case itself clearly delineates when certain persons must be apprised of their rights:

"[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation we mean questioning initiated by law enforcement officers after a person has been taken into custody *or otherwise deprived of his freedom of action in any significant way.*" 384 U.S. at 444, 86 S. Ct. at 1612, 16 L.Ed.2d at 706. (Emphasis added.)

While *Miranda* involved police interrogation inside a room at police headquarters, later cases have held that a suspect may be significantly deprived of his freedom outside that setting. Orozco v. Texas, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969); Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968); Annot., 31 A.L.R.3d 565 (1970).

In State v. Petersen, Me., 268 A.2d 482 (1970) we held that *Miranda* did not apply in a criminal case where the Defendant's admission at the scene of a car accident was otherwise voluntary, where the police officer had no knowledge of the commission of an offense, and where the focus of suspicion had not fallen on the Defendant. In that instance *Miranda* warnings were not necessary because the Defendant was not in custody or otherwise deprived of his freedom.

The record shows the following undisputed facts:

Shortly after 2:30 p. m. that day, the officers confronted the Defendant at a local hotel bar. At that time, Bouchard had given a statement to the police and the collective knowledge of the police undoubtedly gave them probable cause to arrest the Defendant without a warrant. *See* State v. Smith, Me., 277 A.2d 481, 488–489 (1971). He was not only a suspect, he was the sole suspect in the alleged crime. However, *as far as the record shows,* the two police officers who participated in the disputed "questioning" knew only that Headquarters had instructed one of them by radio to "look for" the Defendant who was said to be carrying a gun.

The officers saw the Defendant enter the washroom at the bar. They stationed themselves outside the washroom door and when the Defendant appeared he was accosted by the officers, one of whom seized the Defendant's elbows and raised his arms slightly. The other told the Defendant of their orders and said they intended to frisk[3] him. As he proceeded to do this, the officer asked the Defendant where the

---

1. 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. New counsel has been appointed on this appeal.

3. Although the record does not reveal the exact nature of the search of the Defendant's person which was made, it was described as a "frisk", which we assume to be intended to describe a manual surface touching to determine the possible presence of hidden weapons.

gun was. The Defendant answered that "he did not have the gun with him". This same officer then asked the Defendant what he had done with the gun and the Defendant's reply was "that he had sold it about 5 minutes before, that he no longer had it". The Defendant was then released and the officers entered the washroom and, after unsuccessfully searching two persons in the washroom, they found, hidden behind a broom, a gun which the victim identified as the one used by the Defendant. The officers then left the hotel and arrested the Defendant who was on the sidewalk outside.

The State urges that the warnings were not necessary because the police acted properly under the "stop and frisk" rationale enunciated in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Terry allows police to detain and make a limited, protective search for weapons when the officer has a reasonable belief that the person is armed and presents a danger to the officer and others nearby. Under that principle the policeman need not have probable cause to arrest and make a full-blown search. Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

On these facts we have no doubt that the two officers were justified in detaining the Defendant briefly as they did and in requiring him to submit to a limited Terry type protective search. The precise issue before us, however, is whether incriminating answers given by the detained suspect in response to police questioning should be admitted for jury consideration where the suspect had not been given the benefit of Miranda warnings. First, we have no doubt that this Defendant was significantly deprived of his freedom and that his statements were the result of custodial interrogation—although brief—and that Miranda would have demanded the exclusion of this testimony if it had dealt with almost any other area than that of the presence of a dangerous weapon. Are a

suspect's answers to such questions excepted from the operation of the Miranda rule? We find nothing in the language of the United States Supreme Court which suggests that they are excepted.

We find little precedent anywhere to assist us in determining what role, if any, the officers' questioning and the Defendant's answers may play in a defensive search. Terry, of course, was speaking of Fourth Amendment rights and its holding was directed to protection of the officer and others nearby, rather than to assisting the officer to obtain evidence.

We note that, soon after Terry, in Orozco v. Texas, supra, the United States Supreme Court considered facts with some similarity to our own. The defendant had shot and killed a man at a restaurant, and the officers entered his bedroom at a rooming house four hours later and detained him there while he was immediately and briefly questioned. The defendant was asked his name, whether he had been at the restaurant that night and if he owned a pistol. When he admitted owning a pistol, he was then asked where the pistol was. He answered that it was in a washing machine in another room in the building. It was found there and ballistic tests indicated that it had fired the fatal shot.

The defendant's incriminating statements concerning the gun and his presence at the scene of the shooting were admitted at trial over the defendant's objections. The Court, in a terse opinion, found that the absence of a Miranda warning barred the State's use of the incriminating statements. The Court did not see fit to distinguish between the defendant's admissions that he had been at the restaurant and his response to the officer's question as to the whereabouts of the gun.

We are aware that the Michigan Court of Appeals has applied Terry principles to a defendant's incriminating admissions concerning a gun. In People v. Toler, 45 Mich.App. 156, 206 N.W.2d 253 (1973), two officers coming upon the scene of a

nighttime robbery observed the defendant running away from the victim with a gun in his hand. The officers patted down the defendant and when they found no gun, they asked the defendant where it was. He answered that he had dropped it by the fence when he was shot. The officers found the gun and both it and the officers' testimony concerning the defendant's statement were admitted into evidence.

The Michigan Court of Appeals denied defendant's appeal. The Court stressed that the officers had seen the defendant with the gun only moments before and that, although wounded, he was still dangerous. The Court said:

> "There was only a single question probably aimed at protecting the officers. The objected-to matter pertained to the location of the gun, previously seen by the officers—the logical import of this is that the officers were concerned with their safety and not with building a case against defendant." 45 Mich.App. at 161, 206 N.W.2d at 255.

A similar situation was presented in State v. Lane, 77 Wash.2d 860, 467 P.2d 304 (1970) where the Washington Supreme Court appears to have come to a contrary conclusion. Several days after Lane had committed an armed robbery, police officers crashed into his apartment, told Lane he was under arrest, and handcuffed him. One officer began explaining Lane's *Miranda* rights but another officer interrupted and asked, "Do you have the gun?" Lane gave an incriminating answer (which did not result in a finding of the gun) which the officer's later testimony revealed to the jury. The Washington Court applied the United States Supreme Court's *Terry* rationale as to protective searches to urgent police questioning "strictly limited to protecting the immediate physical safety of the police themselves and which could not reasonably be delayed until after the warnings are given", and found no impropriety in the officer's attempt to determine by his question whether the gun presented an immediate danger.

The Court recognized that the presentation of the defendant's incriminating statement presented a different problem. It decided that this constituted "dubious trial tactics" and rebuked the prosecutor for introducing it but decided that it was not prejudicial and reversible error.

The defendant in an appeal before the Appellate Court of Illinois had used a gun to commit a murder and was apprehended in a hotel room in another area of the city some ten hours later. The police arrested the defendant and, noticing a clip with cartridges on top of a dresser five feet from the bed on which the defendant was sitting, an officer asked the defendant where the gun was. The defendant replied that it was in the bureau drawer. Defendant's motion to suppress the gun was denied, and it was admitted into evidence over the defendant's objections that it was found as a result of the arrested defendant's answer to a police question which had not been preceded by a *Miranda* warning. The Court ruled that it was not a violation of either the letter or spirit of *Miranda* for the police to ask questions limited to their own physical safety. People v. Brown, 131 Ill.App.2d 244, 266 N.E.2d 131 (1970). The Court emphasized, however, that only the admissibility of the gun was in issue— the jury had not been told of the defendant's statement that it was in the bureau drawer.

In Ballew v. State, 246 Ark. 1191, 441 S.W.2d 453 (1969) the officers came upon two men who had committed an armed assault earlier that day. The men ran. The officers shouted to them to stop and then to approach the officers with their hands raised. As the men approached the officers, they were nearly hidden by tall weeds and brush and one of them was seen to stoop down. The officers asked where the shotgun was and one man said "it was nearby in a 'hollow log'". This statement was admitted into evidence over the defendant's objections that he had not received a *Miranda* warning before he answered the officer's question. The Arkansas Su-

preme Court held that the *Miranda* rule was not applicable because the defendant's statement was a "spontaneous admission" and, as an alternate ground, that the officers had a right to inquire as to the presence or whereabouts of the gun for their own safety.

The rationales of these cases do point up the reasons for our hesitation in attempting to graft the *Terry* Fourth Amendment rationale on to the *Miranda* Fifth Amendment rule, as the State urges us to do.

■ We have no doubt that police officers, acting in *Terry* situations, may properly ask questions directed toward ascertaining the presence of weapons which present a danger to the officer or to others nearby. The questions, however, must be strictly limited to accomplishing that proper defensive purpose—they may not be in the nature of fact gathering as a part of the preparation of proof to be used against a defendant in a charge which had been lodged against him.[4]

But what we have before us is not a question of the right of police officers to ask the whereabouts of a gun for their own safety but of the use in evidence of an incriminating admission made during custodial interrogation against a defendant who had not been warned of his rights against self-incrimination.

■ In our opinion the exclusionary rule of the Fifth Amendment and the United States Supreme Court's introduction of the prophylactic *Miranda* rule would have required the exclusion of the Defendant's admissions concerning the gun, if objection had been made.

■ However, as we have said, no objection was made to this testimony when

it was given at trial. After it was given, no motion was made to strike it or to order a mistrial on the grounds that it was improper or prejudicial to the Defendant. No request was made that the Justice should instruct the jury to disregard it or that the Justice should take any action to palliate the effects which the Defendant now argues must have resulted to his detriment. Because of his inaction at trial the Defendant now has the burden of satisfying us that the disclosure of the Defendant's statement was "so highly prejudicial and so [tainted] the proceeding as virtually to deprive the aggrieved party of a fair trial." State v. Langley, Me., 242 A.2d 688, 690 (1968).

■ There was considerable other impressive evidence from which the jury could reasonably have concluded that the Defendant had been in recent possession of the gun. In addition to the victim, the State had produced another witness, Alfred Bolduc, a 16-year-old boy, who testified that he had seen the gun in the Defendant's possession on the street shortly after 2:00 p. m. This witness also said he saw the Defendant hide the gun behind a broom in the washroom upon being told that the two officers were approaching.

Even if the jurors had not heard that the Defendant tacitly acknowledged having had the gun "about 5 minutes before", they had the officers' undisputed testimony as to the Defendant's sudden brief disappearance into the washroom when the officers arrived at the bar and the discovery of the gun there moments later.

We are not satisfied that manifest injustice resulted from this testimony.

We note, too, that the Defendant makes no claim even now that the Defendant's

---

4. Here, the weapon was also admitted into evidence without objection and the Defendant makes no complaint concerning this on appeal.

We see no more objection to the introduction into evidence of a weapon which was located by means of a proper defensive question than one which was located by means of a proper defensive "patting down" of

the suspect, assuming a proper foundation was otherwise laid.

We do not mean to suggest, however, that a defendant's incriminating admission, made in violation of the *Miranda* rule, may or may not furnish a part of this foundation. This issue is not before us.

statement to the officer was involuntary but only that the *Miranda* warnings were absent. The United States Supreme Court, which established this set of specific protective guidelines, has recognized that not all departures from the prophylactic standards of *Miranda* are reversible, *per se*. The Court said in Michigan v. Tucker, —— U.S. ——, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974):

> "Just as the law does not require that a defendant receive a perfect trial, only a fair one, it cannot realistically require that policemen investigating serious crimes make no errors whatsoever. The pressures of law enforcement and the vagaries of human nature would make such an expectation unrealistic. Before we penalize police error, therefore, we must consider whether the sanction serves a valid and useful purpose."

The record here—like that in Michigan v. Tucker, supra—discloses an absence of compulsory self-incrimination and of unlawful police tactics of the type against which the demands of *Miranda* were aimed. The police here were guilty of no impropriety in their frisking and brief questioning of the Defendant whom they reasonably believed to be dangerous to them and to the public and no bad faith is apparent in the officers' reference at trial to the Defendant's answers.[5]

*2. Testimony of a witness for the State concerning another possible crime unrelated to the one for which the Defendant was being tried*

The boy, Alfred Bolduc, a witness for the State, had testified that he had met the Defendant earlier that afternoon at the hotel bar and had walked with him to the Defendant's home, and that the Defendant had handed him the gun during this walk when he saw a police officer approaching. The Defendant's counsel then, on cross-examination, brought out that the witness, being only 16 years of age, was in the bar in violation of law. He then asked the boy his purpose of going with the Defendant to the Defendant's home:

"Q And you went with Eddie Hudson from the Manoir to his house on Knox Street?

A Yes.

Q Why was that?

A We were supposed to make an exchange.

Q And were you to get some drugs?

A Yes.

Q So you went into the Manoir and you had another purpose when you came out?

A Yes.

. . . . . .

Q On this 13th day of March, Mr. Bolduc, had you been taking any of these drugs?

A No.

Q Do you use drugs?

A No.

Q Had you used any drugs prior to the 13th of March?

A No.

Q You wanted some?

A I didn't want them for me.

Q Were you doing this for a friend?

A Yes."

■ The Defendant now complains that the Presiding Justice should have cautioned the jurors to avoid acquiring prejudice against the Defendant as a result of their hearing this testimony. The possibility that the Defendant and the Bolduc boy were engaged in a drug transaction that afternoon was injected into the trial for the first time by the Defendant's counsel

---

5. This testimony was not given in response to specific inquiry by the prosecutor.

in his cross-examination of the witness. Furthermore, it was obviously a deliberately chosen attempt to discredit the boy as a witness and lessen the apparently devastating impact of the testimony he had just given on direct. It is clear that the defense expected the answer it received to the question "And were you to get some drugs?" Having chosen for tactical reasons to ask the leading question, he cannot on appeal successfully complain of the effect of the responsive answer which he received. State v. Wilbur, Me., 278 A.2d 139 (1971). On re-direct examination the prosecuting attorney questioned the witness briefly concerning this particular episode and the witness repeated some of his statement concerning drugs. There was no objection by the Defendant, no motion to strike this testimony and no motion for a mistrial. The Defendant evidently was resolved to rest his fate with the jury before whom he had attempted to discredit the State's witness. He chose to make no request for a cautionary instruction as to this testimony and it lay in the Justice's discretion whether or not to give such an instruction which the Justice may have felt might even emphasize the Defendant's role in the drug transfer.

We find no manifest error in the fact that while the Justice gave the jury the usual cautionary instruction against being influenced by sympathy, prejudice or public opinion, he made no specific reference to the testimony concerning drugs.

*3. The testimony of Officer Poulin as a prior statement of a witness for the defense*

The Defendant, who chose not to testify, presented as a witness a Mr. Becker who testified that he had seen Mr. Bouchard with the gun earlier that day and that Bouchard had offered to sell the gun to him. He also said he had not observed the confrontation between Bouchard and the Defendant at which the State claims the assault took place. The State then called Officer Poulin as a rebuttal witness and he was asked if he had had a conversation with Mr. Becker later on the day of the incident in question.

 Defense counsel then objected on the ground that the Defendant had not been present during the conversation. The Presiding Justice correctly overruled the objection. Testimony concerning words spoken in the absence of the Defendant does not render the testimony inadmissible, per se. A recounting of spoken words, if relevant and not barred by a rule of exclusion, such as the hearsay rule,[6] does not depend upon the Defendant's presence for validity (although his presence may under some circumstances give it a relevance otherwise lacking). In this case relevance was supplied by its potential bearing upon the credibility of the witness, Mr. Becker.

 Authority is abundant for the proposition that evidence of a statement made on a prior occasion is admissible to contradict the testimony a witness has given. State v. Robbins, Me., 318 A.2d 51 (1974); State v. Pullen, Me., 266 A.2d 222 (1970).

 The Justice said Officer Poulin's testimony would be admitted to "contradict" the witness. The officer then testified that the witness (who had said on the stand that he had seen Mr. Bouchard with the gun) had told him that day that he had never seen the gun. The officer then went on to testify that he asked the witness if he had "seen the Hudsons anywhere around" that day and that the witness

"looked at me for a minute and he shook his head and he said, 'You know, Norman, those Hudsons are bad boys', he

---

6. Assertions offered to prove the truth of matters asserted therein and resting for their evidentiary value upon the credibility of the out-of-court reporter must be excluded as hearsay. State v. O'Clair, Me., 292 A.2d 186, 194 (1972). Evidence is relevant if it has probative value in establishing or negating a fact or issue at hand. State v. Northup, Me., 318 A.2d 489, 493 (1974).

says, 'that's all I can say', and he walked away."

No further objection was made to the testimony of which the Defendant now complains and no motion to strike and no request for explanatory instructions were made. The Defendant argues that the officer's testimony as to the witness' answer was hearsay and prejudicial to the Defendant. The testimony was not hearsay because it was not offered to prove the truth of the words uttered (i. e., that the Hudsons were "bad boys") but, instead, it was offered to cast doubt upon the reliability of Mr. Becker's testimony—a proper purpose somewhat beyond that of contradiction specified by the Justice. The cryptic answer of the witness and the manner in which it was delivered could reasonably be interpreted by the jury as intending to convey a fear of the Defendant and his brothers which would foreclose any likelihood of any testimony by that witness which would be adverse to the Defendant's interest.

 In such a situation it lies in the discretion of the Justice to balance the probable probative effect of the testimony against its possible prejudicial effect and decide whether justice required him to order that it be struck from the record and that the jury disregard it. There was no error in his failure to do so *sua sponte* and we are not convinced that manifest injustice occurred.

The Defendant also contends that he was deprived of a fair trial by the Justice's reading to the jury, during his charge, a portion of the testimony of the alleged victim of the assault, a State's witness. This, the Defendant argues, unduly emphasized some of the prosecution's evidence and may also have been interpreted by the jury

as being an endorsement of the reliability of the particular testimony, which is forbidden by 14 M.R.S.A. § 1105.[7]

The language of the Justice as to which the Defendant now complains follows:

"So what happened in this case? The State contends through its witnesses that the Defendant accosted Mr. Bouchard, Raymond Bouchard, on Lisbon Street, I think, in front of Bisson's Pawn Shop, and in effect said to him, are you going to squeal on me? It is for you to remember exactly what was said, but so we know exactly what was said, I had the reporter write out for me the following colloquy between the two: 'Question: What happened next, please? Answer: He told me, "You had better not, because he could get eleven months for this." And after that he pulled a gun and he said, "Look, I don't care, I'll shut you up right now." Question: What did he do with the gun? Answer: He pulled it out and pointed it at me, at my stomach. Question: And would you tell us whether or not the gun was touching your stomach? Answer: Yes, sir, it was. Question: What happened next? Answer: So after we stopped talking about that, he put the gun away.' Well, that wasn't the whole story, but that is part of it. That had to do with the presence of the gun and what was done with it. So it is for you to decide whether or not there was a gun, was the gun in possession of the Defendant, and how it was used, if it was used."

Near the beginning of his charge the Justice explained to the jurors that they are the sole "triers of fact". He also noted that Maine law forbids a judge from

---

7. "During a jury trial the presiding justice . . . shall not, during the trial, including the charge, express an opinion upon issues of fact arising in the case, and such an expression of opinion is sufficient cause for a new trial if either party aggrieved thereby and interested desires it, and the

same shall be ordered accordingly by the law court on appeal in a civil or criminal case."
This statute has existed in substantially the same language since 1874. *See* P.L.1874, ch. 212.

commenting on the evidence, and that he himself had no opinion on the evidence. Additionally, he stated:

"If you think because of anything I have said, any rulings I have made, that I expressed an opinion directly or indirectly to you, you are to disregard it, because that is absolutely false."

On one later occasion, the Justice reminded the jurors that they are the sole fact-finder in the case.

This Court has found that the fairness of a charge must be determined by a review of the charge in its entirety and not from an examination of isolated phrases. *E. g.*, State v. Jewell, Me., 285 A.2d 847 (1972).

We agree with the Defendant that it is essential that the Justice exercise great care that his treatment of the testimony of the witnesses does not suggest to the jury an endorsement of one party's point of view. If he finds it necessary to direct the jury's attention to specific testimony he must avoid prejudicial misquoting. State v. Shannon, 135 Me. 325, 196 A. 636 (1938). If the Justice attempts a summation of the evidence, the position of one side must not be emphasized unfairly. State v. Brown, 142 Me. 16, 45 A.2d 442 (1946). A Justice seeking to unravel evidentiary complexities for the jury's benefit should do so impartially by considering adequately both prosecution and defense aspects of the factual issue at hand.[8]

No objection was made by the defense to the reading of the testimony by the Justice and no request that any counterbalancing testimony of defense witnesses be also read. Therefore, our question is one of whether manifest error has been demonstrated. While, from our vantage point no complexities appear to have required the reading of this particular testimony, the exclusivity of the jury's role in

fact finding was made clear to the jurors and we are not satisfied that the reading of this testimony resulted in manifest injustice.

The entry will be:

Appeal denied.

DELAHANTY, J., did not sit.

All Justices concurring.

---

8. Of course, we do not mean to suggest that a Justice may not comply with a jury's request to have read to them certain specific testimony.