UNITED STATES of America, Plaintiff,

v.

Rigoberto Raciel MESA, Defendant.

Crim. No. 80–46.

United States District Court,
D. New Jersey.

April 8, 1980.

Robert J. Del Tufo, U. S. Atty. by Barry Ted Moskowitz, Asst. U. S. Atty., Newark, N. J., for plaintiff.

John J. Hughes, Asst. Federal Public Defender, Camden, N. J., for defendant.

HAROLD A. ACKERMAN, District Judge.

Rigoberto Mesa has been indicted in six counts alleging violations of 18 U.S.C. § 113(a), (c) and (f) in connection with the shooting of his "common-law wife", Karin Little, and his daughter, Sonia Mesa. He was arrested by the Federal Bureau of Investigation after a four and one-half hour confrontation at the El Sombrero Motel in Browns Mills, New Jersey. For approximately three and one-half hours of this confrontation, Mr. Mesa spoke over a mobile telephone unit with Theodore Viater, an FBI Agent who has had special training in hostage negotiation. Mr. Viater taped almost all of this conversation. In the course of his three and one-half hour talk with Mr. Viater, Mr. Mesa made several inculpatory statements that the prosecution would like to make a part of its case in chief. The defense has moved, pursuant to 18 U.S.C. § 3501, for the suppression of this evidence due to the failure of Mr. Viater to read to Mr. Mesa the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

*Miranda* warnings must, of course, be given whenever law enforcement authorities engage in a "custodial interrogation." The Supreme Court has defined that term as follows: "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612, *quoted in Oregon v. Mathiason*, 429 U.S. 492, 494, 97 S.Ct. 711, 713, 50 L.Ed.2d 714 (1977). Mr. Mesa's motion presents the novel question of whether an armed suspect, who has not yet been formally arrested but who is barricaded in a motel room surrounded by nearly thirty law enforcement officers, is sufficiently within police custody to require *Miranda* warnings. The motion also raises the question of whether Mr. Viater's conversation with Mr. Mesa constituted interrogation. I have concluded that the answer to both of these questions is yes, and that the evidence should be suppressed.

### FINDINGS OF FACT

On April 3, 1980 I conducted a hearing in accordance with the requirements of *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) and 18 U.S.C. § 3501, in order to ascertain the facts surrounding Mr. Mesa's conversation with Mr. Viater. *See United States v. Arcediano*, 371 F.Supp. 457, 459 (D.N.J.1974). At this hearing I heard testimony concerning Mr. Mesa's suppression motion from two FBI Agents, Dominic D. Di Domenico and Theodore Viater, and also received several exhibits, including the tape recording of the conversation at issue, in evidence for purposes of this motion. On the basis of this hearing I have made the following findings of fact:

On January 29, 1980, Mr. Di Domenico, along with two other FBI Agents, was investigating the shooting of Ms. Little and Ms. Mesa that had occurred the day before. In particular, he was trying to locate the defendant, Rigoberto Mesa, for whom he had an arrest warrant charging assault with intent to commit murder. At about 2:00 P.M. Mr. Di Domenico's information led him to the El Sombrero Motel, where he learned that Mr. Mesa had barricaded himself into his room sometime before 10:00 A.M. Upon being informed of this, the three Agents evacuated the rooms on each side of Mr. Mesa's room and proceeded to

barricade the adjoining area including blockading the streets that afforded ingress and egress to the Motel. The Agents also notified the Military Police, the local police, and other law enforcement authorities. After taking these preliminary steps, the Agents parked their car directly in front of Mr. Mesa's room and, utilizing a bullhorn on the top of the car, said: "Mr. Mesa, this is the FBI, we have a warrant for your arrest, come out with your hands raised." There was no response from inside the room.

Within a few minutes of this initial announcement, additional police officers began to arrive on the scene to assist the three FBI Agents. In less than twenty minutes nearly thirty law enforcement officials were on the scene. The FBI repeated their statement over the bullhorn more than ten times during the first hour of the confrontation, but Mr. Mesa continued to refuse to surrender. At sometime early in this confrontation, Mr. Di Domenico called the Trenton FBI office and requested the assistance of Theodore Viater of the Newark office, because of Mr. Viater's special training in hostage negotiation. It was apparently unclear to the Agents at that time whether Mr. Mesa was holding any hostages and what weapons, if any, Mr. Mesa possessed. It later developed that he had no hostages, but did have a .25 calibre pistol.

By the time Mr. Viater arrived on the scene at approximately 3:00 P.M., Mr. Mesa had already passed three notes from his room to the FBI Agents on the outside. These notes were picked up by Mr. Di Domenico who removed them from under the door. At no time were any shots fired. These notes were entered into evidence and read as follows:

Note one (Exhibit D-1): "Have a little patience. I will give myself up. My mind is too confused. I won't hurt anybody so wait till dark and call the M.P. I give you my words I really need to see a psychiatrist. To many people. Please tonight and will come out only to the M.P."

Note two (Exhibit D-2): "If I say I have a gun you will storm the place. I said I don't want to hurt anybody. If you really know what I have been through this inner voice what don't let me alone. I have been done everything. I am not a criminal but please give me a little more time. Your wife will be impatient. At least you have someone to come. I never have that. I try so hard to make so good."

Note three (Exhibit D-3): "The guy that pick up my note, please tell him that if I want to hurt him I got the chance twice so if he bring the phone act like a man. I am not a criminal."

When Mr. Viater arrived it was determined that there was no commercial telephone in Mr. Mesa's room and that it would be necessary to use a mobile telephone if Mr. Viater was to talk with Mr. Mesa. Accordingly, the FBI used the bullhorn to ask Mr. Mesa if he would take a telephone receiver into his room in order to talk to Mr. Viater. Using hand signals, Mr. Mesa indicated that he would. At that point a telephone was placed outside the door and after the Agents left the immediate vicinity of the doorway Mr. Mesa took the telephone into his room.

For the next three and one-half hours or so Mr. Viater and Mr. Mesa spoke over the telephone. At the end of this conversation, Mr. Mesa surrendered peacefully. Mr. Viater tape recorded this conversation on three cassettes that have been marked in evidence as Exhibit G-9, and I have listened to these recordings. At no time in the conversation were *Miranda* warnings given. Throughout the conversation Mr. Viater lends a sympathetic ear to Mr. Mesa's tale of troubles. For example, the first thing Mr. Viater is heard to say on the tape is:

Yes, Rigoberto, I am listening to you very intently, I can, I have empathy for what you're saying, I understand exactly the things you are expressing to me. And I want you to know I understand and be aware of the fact that I am here to help you. Are you, are you aware of that?

At other times, Mr. Viater asks questions. For example, early in the first cassette, the following exchange is heard:

565

Viater: Tell me what happened Rigoberto?

Mesa: What happened what?

Viater: Tell me what happened yesterday. What was the provocation?

Mr. Viater tried to establish an atmosphere of trust between himself and Mr. Mesa. Representative of the many remarks that Mr. Viater made along these lines is the following:

I'm concerned about you Rigoberto, I'm concerned about your welfare, and I'm concerned about your health and I want to make absolutely certain that you and I trust each other and we can bring this problem to a successful solution.

The conversation meanders through many areas, including Mr. Mesa's experiences in Viet Nam, his relationships with his family, and other events of Mr. Mesa's life as well as the events of the previous day. At the end of the conversation, Mr. Viater arranges for Mr. Mesa's surrender.

The tape recording does not include the entire conversation. Mr. Viater testified that the beginning 5% of the conversation is missing. The only evidence of what was discussed was Mr. Viater's testimony that he began the conversation by introducing himself, identifying himself as an FBI Agent who specialized in hostage negotiation, and telling Mr. Mesa that he was there to help him. Mr. Viater also testified that he wanted to create an atmosphere of mutual trust between himself and Mr. Mesa and I conclude, after listening to the tape, that such an atmosphere was created.

According to Mr. Viater, his function and purpose during the confrontation was to defuse a volatile situation in which lives might have been lost. I believe Mr. Viater's testimony in this regard and I wish to commend both Mr. Viater and the other law enforcement officials on the scene for their handling of a dangerous situation. Their conduct reflected a concern over the safety of not only themselves and the general public, but of Mr. Mesa as well. The course followed at the El Sombrero Motel was certainly preferable to the shootout that might have occurred if other actions were

taken. Nevertheless, after listening carefully to the tapes, I find from the fact that Mr. Viater directed and encouraged Mr. Mesa's conversation several times towards the events of the preceding day, and from the fact that he tried to establish an atmosphere of trust so that Mr. Mesa would speak to him freely, that Mr. Viater had a secondary purpose of gathering information about Mr. Mesa's possible involvement in the criminal assault that he has been charged with. From the beginning of the conversation, it was clear that Mr. Viater wanted Mr. Mesa to talk with him. This talk defused the situation, but it also yielded information relevant to the FBI's investigation. I conclude that Mr. Viater knew his conversation might perform both of these functions and that he wanted it to perform both functions. The information gathering function was secondary, but it was there.

THE CUSTODY ISSUE

Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) requires the suppression of inculpatory statements obtained as a result of a "custodial interrogation" when Miranda warnings are not given at the outset of the interrogation. The question of when a person is in custody for Miranda purposes is a controversial one, and has been addressed by the Supreme Court on several occasions. See Oregon v. Mathiason, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); Beckwith v. United States, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976); Orozco v. Texas, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969); Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968). Throughout, the Court has reiterated the original Miranda definition that custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444, 86 S.Ct. at 1612 quoted in Oregon v. Mathiason, 429 U.S. at 494, 97 S.Ct. at 713. In its decision of the Mathiason case, the Court made it clear that its

principal focus is whether the suspect is free to go. 429 U.S. at 495, 97 S.Ct. at 714.

Courts nationally have split over the issue of whether an objective or a subjective standard should be employed in determining custody. Using an objective test, a court must determine whether a reasonable person would have believed himself to be in custody. When a subjective test is employed, a court determines whether the defendant thought he was in custody or whether the police officer thought the defendant was in custody. *See generally Hunter v. State*, 590 P.2d 888 (Alaska Sup. Ct.1979). In the Third Circuit, as in the majority of jurisdictions, the objective view prevails. *Steigler v. Anderson*, 496 F.2d 793 (3d Cir. 1974).

In *Steigler* the Third Circuit quoted at length from the Second Circuit's opinion in *United States v. Hall*, 421 F.2d 540 (2d Cir. 1969), in providing this explanation of "the mandate of *Miranda* ":

> [W]e do think it suggests that in the absence of actual arrest something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so.

*Steigler*, 496 F.2d at 799 *quoting United States v. Hall*, 421 F.2d at 545.

Applying these standards to Mr. Mesa's situation at the El Sombrero Motel, it seems clear that a reasonable person would conclude that Mr. Mesa had been deprived of his freedom in a significant way. By the time his conversation with Mr. Viater began, Mr. Mesa was surrounded by nearly thirty law enforcement officials. There can be no doubt that these officials "would not have heeded a request to depart or allow the suspect to do so." There were only three ways that Mr. Mesa could have left that Motel room: dead, injured and under arrest, or uninjured and under arrest.

The only fact that gives pause to my conclusion that Mr. Mesa was in custody is the fact that he had a gun. Despite his notes indicating that he did not want to harm anyone, it was entirely reasonable for the police officers to fear that any attempt to place Mr. Mesa under arrest might result in serious injury or death to one of their colleagues. Some courts, recognizing the inherent danger of guns, have carved out an exception to the *Miranda* rule permitting police officers to make inquiries concerning weapons that might affect their own or the public's safety after a suspect is in custody. *See, e. g. United States v. Castellana*, 500 F.2d 325 (5th Cir. 1974) (en banc). Other courts have refused to do so. *See, e. g. State v. Vargus*, 373 A.2d 150 (R.I.Sup.Ct. 1977). The cases which have recognized this exception have not, however, suggested that the defendant was not in custody. They have instead drawn an analogy to the Supreme Court's decision in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and concluded that such questions are reasonable and minimally offensive security measures. *E. g., United States v. Castellana*, 500 F.2d at 326; *see also People v. Mullins*, 188 Colo. 23, 532 P.2d 733 (1975); *State v. Hudson*, 325 A.2d 56 (Me.Sup.Ct. 1974); *State v. Lane*, 77 Wash.2d 860, 467 P.2d 304 (1970) (en banc). These gun cases are inapposite to Mr. Mesa's case because the officers at the El Sombrero Motel already knew that Mr. Mesa was armed and did not need Mr. Viater to discover that fact. Moreover, Mr. Viater's conversation went far beyond the subject matter of permissible interrogation under cases like *United States v. Castellana*. The fact that these cases are inapposite does not, of itself, reinforce the conclusion that Mr. Mesa was in custody. Nevertheless, I can only conclude that despite the fact that he had a gun, Mr. Mesa could not have had a reasonable expectation of being allowed to go free, or even of being able to escape. I am satisfied that he was in custody.

## THE INTERROGATION ISSUE

The question of what constitutes interrogation under *Miranda* is presently before the United States Supreme Court. *State v. Innis*, 391 A.2d 1158 (R.I.Sup.Ct.1978) *cert. granted sub nom. Rhode Island v. Innis*, 440

U.S. 934, 99 S.Ct. 1277, 59 L.Ed.2d 492, 47 U.S.L.W. 3571 (1979). The case has been argued and awaits decision. *See* 26 Criminal L.Rep. 4080 for a report of the argument. Ideally, it would be nice to know what the Supreme Court will decide in the *Innis* case. That, however, is impossible since the defendant is entitled to a decision of his motion without undue delay, *see* 18 U.S.C. §§ 3161 *et seq.*, so I must do the best that I can in accord with existing precedent. Returning to the key phrase in *Miranda*, interrogation is "questioning initiated by law enforcement officers." 384 U.S. at 444, 86 S.Ct. at 1612. It is clear in the present case that law enforcement officers initiated the conversation. Mr. Di Domenico summoned Mr. Viater and Mr. Viater suggested the installation of the mobile phone, so that prong of the *Miranda* definition is certainly satisfied in the present case. What is at issue is whether Mr. Mesa was questioned or whether he was just spoken to in order to calm him down.

I have already noted that early in the tape Mr. Viater asks Mr. Mesa, "Tell me what happened yesterday. What was the provocation?" At this point Mr. Viater is clearly interrogating Mr. Mesa about his suspected criminal activity. Accordingly, the entire tape following this question must be stricken.

But what of the remaining portion of the tape, preceding this question? The Government argues that this was a completely voluntary statement, falling within the exception recognized in *Miranda* that

> There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.

384 U.S. at 478, 86 S.Ct. at 1630.

The prosecution bears the burden of proving voluntariness by a preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); *United States v. Arcediano*, 371 F.Supp. 457, 466 (D.N.J.1974). I do not believe that they have met that burden, because it is clear that the FBI initiated the conversation and that Mr. Viater, in effect if not in words, asked Mr. Mesa to speak with him. This was hardly a case of a suspect telephoning the police and telling his tale, here the police not only initiated the call but installed the telephone as well.

A conclusion that Mr. Mesa's statements were not volunteered within the meaning of the *Miranda* exception does not necessarily mean that he was being interrogated. When he testified, Mr. Viater denied asking any questions prior to the portion of the conversation that was taped. Accepting that statement as true, I still conclude that Mr. Viater's statements to Mr. Mesa were intended to get Mr. Mesa to talk and, as I have already noted, Mr. Viater intended from the outset to not only defuse the situation, but to gather information as well. It may be that Mr. Mesa was not interrogated in the traditional question and answer manner, but the psychological form of interrogation, the talk-to-me-I'm-your-friend approach, may elicit information just as effectively, or even more effectively, than the traditional approach. This may be especially true when the suspect is under great emotional stress, as Mr. Mesa was, and is already a psychiatric patient, as Mr. Mesa was. I don't believe that the Constitutional definition of interrogation depends on whether the officer's voice rose at the end of the phrase or whether a stenographer would have placed a question mark at the end of a transcription of the officer's statement. Here Mr. Viater initiated the conversation with the intent to gather information from Mr. Mesa. I hold that there was interrogation from the outset of the conversation.

As a final matter, and without trying to predict the outcome of the *Innis* case in the Supreme Court, I would like to note that Mr. Mesa's case differs from *Innis*. In *Innis* the prosecution contends that the officers were speaking amongst themselves about the danger posed by an abandoned

gun in an area frequented by handicapped children and that they had no intention of even eliciting a response from the suspect, much less information concerning the crime. In the present case I have found as a factual matter that Mr. Viater not only intended to elicit a response from Mr. Mesa, but was interested in gathering information about the crime as well.

### CONCLUSION

In sum, I have concluded that Mr. Mesa was in custody at the time that he had his conversation with Mr. Viater and that Mr. Viater interrogated him. Because this custodial interrogation took place in the absence of *Miranda* warnings, the evidence obtained must be suppressed.

Mr. Viater performed outstanding police work insofar as he defused a volatile situation without injury to the police, the public, or Mr. Mesa. Nevertheless, he failed to accord proper respect to Mr. Mesa's Fifth Amendment rights by gathering information for use in the prosecution. If law enforcement agencies wish to use skilled professionals like Mr. Viater for the dual purpose of defusing a situation and gathering evidence to be used in court, then they must insist that *Miranda* warnings be employed. If they only wish to defuse the situation, then they needn't bother giving *Miranda* warnings, but they cannot use any evidence that they may gather in court. I do not think that courts should attempt to second guess skilled professionals like Mr. Viater who are working in tense situations like the one in this case over questions of whether *Miranda* warnings could have been given without aggravating the situation. People like Mr. Viater are well-trained to use their judgment. But courts must give due regard to the Fifth Amendment, and not allow defendants to be convicted on the basis of self-incriminating statements that were not obtained in accordance with the principles of *Miranda* and other cases that protect the precious Fifth Amendment right. I believe that my decision today protects those rights without unduly restricting police activity.

An Order in conformance with this Opinion has been filed this day.