**UNITED STATES of America,**
**Appellant,**

v.

**Rigoberto Raciel MESA.**

**No. 80–1510.**

United States Court of Appeals,
Third Circuit.

Argued July 11, 1980.

Decided Oct. 30, 1980.

As Amended Nov. 12, 1980.

As Amended on Denial of Rehearing and Rehearing In Banc Dec. 4, 1980.

Robert J. Del Tufo, U. S. Atty., Barry Ted Moskowitz (argued), Asst. U. S. Atty., Newark, N. J., for appellant.

John J. Hughes (argued), Asst. Federal Public Defender, D. New Jersey, Camden, N. J., for appellee.

Before SEITZ, Chief Judge, ADAMS, Circuit Judge, and WEINER, District Judge.*

## OPINION

SEITZ, Chief Judge.

This is an appeal by the government from an interlocutory order of the district court, 487 F.Supp. 562, granting the motion of the defendant, Rigoberto Mesa, to suppress a tape–recorded conversation between Mesa and an FBI agent. Jurisdiction is based on 18 U.S.C. § 3731 (1976).

## I.

The facts are undisputed. On January 28, 1980, Karin Little, Mesa's "common-law" wife, and Sonia Mesa, his daughter, were shot and wounded. Later that day, the victims, both of whom survived, informed the FBI that Mesa had inflicted their injuries. The FBI was unable to locate Mesa on January 28 and obtained a warrant for his arrest from a United States Magistrate the next morning. At approximately 2:00 p. m. on January 29, three FBI agents went to the El Sombrero Motel in Brown Mills, New Jersey and inquired about Mesa. They learned that Mesa had barricaded himself in his room sometime before 10:00 a. m. that day. The agents evacuated the rooms on each side of Mesa's room and blocked off traffic in the vicinity.

The agents then called to Mesa through a bullhorn, informed him that they were FBI agents, that they had a warrant for his arrest, and that he should come out with his hands raised. Mesa did not respond. The agents repeated their statement between ten and twelve times over the course of approximately one hour, but Mesa still did not respond. During this period, additional law enforcement officials arrived at the scene. Eventually, between twenty–five and thirty officers surrounded the motel.

The agents believed that Mesa was armed, and they did not know whether he had hostages. Because they deemed it inadvisable to forcibly take Mesa into their custody, the agents requested the assistance of Special Agent Theodore Viater, the FBI's hostage negotiator for the area.

When Agent Viater arrived, the agents decided that because there was no commercial telephone in Mesa's room it would be necessary to use a mobile telephone to talk with Mesa. An FBI agent then used the bullhorn to ask Mesa if he would take a telephone receiver into the room to talk with Viater. Mesa indicated by hand signals that he would take the phone.[1]

Viater and Mesa then conversed over the mobile phone for approximately three and one half hours. This conversation primarily involved long narrative monologues by Mesa, with Viater passively listening. Viater had been informed that Mesa had been under psychiatric care and that he might

---

* Honorable Charles R. Weiner, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

1. Before this phone connection was established, the only communications the agents had received from Mesa were three notes that he had slipped under the door. In these three notes, Mesa had indicated that he had the capacity to harm the officers, but that he did not want to harm them. He also indicated that he eventually would give himself up, but that he needed more time. Finally, he had informed the officers that he needed to see a psychiatrist because an "inner voice" was bothering him.

have suicidal tendencies. The comments Viater made during the conversation were supportive and seemed designed to keep Mesa talking in order to establish a relationship of trust. The following comment is representative:

I'm concerned about you Rigoberto, I'm concerned about your welfare, and I'm concerned about your health and I want to make absolutely certain that you and I trust each other and we can bring this problem to a successful solution.

During this conversation, Mesa discussed his experiences in Vietnam, his relationship with his family during his childhood in Cuba, his relationship with his "common–law" wife and children, other events of his life, and the events surrounding the shooting on January 28. Viater generally limited his interjections into this narrative to comments such as "Umhum" and "I understand," with an occasional question concerning Mesa's most recent statement or a longer comment evidencing understanding for Mesa's situation. Viater hoped that by establishing this atmosphere of trust he could convince Mesa to surrender without harming himself or any of the officials in the area.

Mesa finally surrendered peacefully at approximately 6:30 p. m. At this point, the FBI agents gave Mesa the warnings specified in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). After he had surrendered, Mesa thanked Viater for listening to him and stated that he would have killed himself had it not been for Viater.

At no time during the taped conversation did Viater give Mesa *Miranda* warnings. Mesa argues that the contents of the conversation should be suppressed because of the failure to give these warnings. The district court conducted a hearing on Mesa's motion to suppress on April 3, 1980. It held that the taped conversation must be suppressed because Viater's conversation with Mesa constituted "custodial interrogation" within the meaning of *Miranda*. I now will consider whether the FBI's conduct was "custodial interrogation" as contemplated by the *Miranda* Court.

II.

*Miranda* held that when the government conducts a "custodial interrogation," it may not introduce statements made by the defendant at this interrogation unless he first had been given the now–familiar *Miranda* warnings.[2] This court has recognized that "custodial interrogation" is not susceptible of an exact definition; thus the determination whether statements are the product of such "custodial interrogation" must be made on a case–by–case basis. *See Steigler v. Anderson*, 496 F.2d 793, 799 (3d Cir.), *cert. denied*, 419 U.S. 1002, 95 S.Ct. 320, 42 L.Ed.2d 277 (1974); *United States v. Clark*, 425 F.2d 827 (3d Cir.), *cert. denied*, 400 U.S. 820, 91 S.Ct. 38, 27 L.Ed.2d 48 (1970). Because the application of *Miranda* to the present fact situation is novel, I think that it is necessary to examine the precepts underlying the *Miranda* rule to determine whether this evidence must be suppressed, rather than relying on a more rigid definitional approach.

*Miranda* warnings are designed to protect against the evils of "custodial interrogation," and they are not intended to unduly interfere with a proper system of law enforcement or to hamper the police's traditional investigatory functions. *See Miranda v. Arizona*, 384 U.S. at 481, 86 S.Ct. at 1631, 16 L.Ed.2d 694. Therefore, the warnings need be given only "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning." *Id.* at 478, 86 S.Ct. at 1630. Since *Miranda*, the Court has indicated that to determine whether there has been a

---

2. *Miranda* requires that the suspect:

be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda v. Arizona*, 384 U.S. at 479, 86 S.Ct. at 1630, 16 L.Ed.2d 694.

"custodial interrogation," a court must make two discrete inquiries. First, it must determine whether the suspect was in "custody." *See Orozco v. Texas,* 394 U.S. 325, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969). If the suspect was in "custody", the court then must decide whether the police interrogated him. *See Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Therefore I will look to the *Miranda* decision itself and the meaning the Court ascribed to "custody" to determine whether Mesa was in the custody of the FBI.

In *Miranda,* the Supreme Court reviewed four cases to determine whether the police had violated the criminal defendants' fifth amendment privilege against self–incrimination. The Court recognized that each of these cases involved "incommunicado interrogation of individuals in a police–dominated atmosphere, resulting in self–incriminating statements without full warnings of constitutional rights." 384 U.S. at 445, 86 S.Ct. at 1612, 16 L.Ed.2d 694. The Court reasoned that *Miranda* warnings were required in this setting to inform a suspect of his rights in order to protect him from the compulsion inherent in in–custody interrogation. The Court considered this protection necessary to ensure that any statement he made was the product of free choice.

The Court examined in detail the "in–custody" setting in which the warnings were needed to protect a suspect from police interrogation. The Court first recognized that physical coercion during interrogation was sufficiently widespread to be the object of concern, but it emphasized that the "modern practice of in–custody interrogation is psychologically rather than physically oriented." 384 U.S. at 448, 86 S.Ct. at 1614, 16 L.Ed.2d 694.

The fact that in–custody interrogation takes place in private was central to the Court's decision that *Miranda* warnings were necessary to ensure that statements made by a suspect during interrogation are the product of free choice. The Court noted that the private nature of police interrogation results in secrecy and thus makes it impossible for a court to determine exactly what transpires in interrogation rooms. More important, the Court recognized that police interrogation manuals inform interrogating officers that privacy is the "principal psychological factor contributing to a successful interrogation." 384 U.S. at 449, 86 S.Ct. at 1615, 16 L.Ed.2d 694 (quoting Inbau & Reid, *Criminal Interrogation and Confessions* 1 (1962)).

The Court reviewed different interviewing techniques discussed in the police manuals that trade on the suspect's insecurity about himself or his surroundings–insecurity that is greatly exacerbated by the fact that he is alone with the law enforcement official who is interrogating him. The Court was concerned about the interrogator's ability to employ these interviewing strategems and thus compel the suspect to incriminate himself. The Court described the atmosphere of "custodial interrogation":

> To be alone with the subject is essential to prevent distraction and to deprive him of any outside support. The aura of confidence in his guilt undermines his will to resist. He merely confirms the preconceived story the police seek to have him describe. *Patience and persistence, at times relentless questioning,* are employed. . . . It is important to *keep the subject off balance,* for example, by *trading on his insecurity about himself or his surroundings. The police then persuade, trick, or cajole him out of exercising his constitutional rights.*

*Id.* at 455, 86 S.Ct. at 1617 (emphasis added). The Court felt that the suspect's isolation in this police–dominated atmosphere mandated that his statements not be admitted into evidence unless warnings had been given before the interrogation.

The evils inherent in this custodial setting were the secrecy involved, the fact that the interrogator was alone with the suspect and thus could employ any number of subtle psychological pressures, and the fact that the suspect's will was much more likely to be worn down when he was interrogated while alone in an atmosphere controlled by the police. Therefore, the key aspect of the

custodial setting as described in *Miranda* is the isolation of the suspect in a room that is dominated by the law enforcement officials who will interrogate him. In this setting, the police have immediate control over the suspect–they can restrain him and subject him to their questioning and apply whatever psychological techniques they think will be most effective. As the Court noted, "[a]n individual swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to the techniques of persuasion described above cannot be otherwise than under compulsion to speak." *Id.* at 461, 86 S.Ct. at 1621. Moreover, in this setting, it is feasible for the police to give the suspect these warnings; they need not be concerned that giving these warnings may have devastating ramifications.

The circumstances under which Mesa talked with Viater can be distinguished from the custodial setting that concerned the *Miranda* Court. Mesa successfully had barricaded himself in his motel room in such a way that he prevented the law enforcement officials from exercising immediate control over his actions. They could not compel Mesa even to listen to any questions they might want to ask, much less subject him to the interviewing techniques or "tricks" that concerned the *Miranda* Court. They had no power to handcuff him or use other reasonable means to confine him in such a manner that he had no choice but to listen to questioning.

The conversation between Mesa and Viater did not occur in a setting where Viater was alone in a room or other enclosed area with Mesa and thus had eliminated all possible distractions. Mesa was free to terminate the phone conversation at any time, either completely or temporarily whenever he was tired of talking. The tape transcript indicates that, although Viater wanted to keep the conversation going to ensure that Mesa would not harm himself, he was always agreeable when Mesa wanted to take a break and would interrupt those breaks only to determine that Mesa had not harmed himself. Mesa in fact took several breaks to smoke cigarettes and to rest.

The FBI agents not only were prevented from controlling the timing of the conversation with Mesa, they also could not control its substance. Mesa was not in a police–dominated atmosphere in which the police could dictate the subjects to be discussed. In this situation, Mesa himself controlled the direction of the conversation and he was free to discuss anything he wanted. There is no indication on the tape that Viater attempted to control the direction of Mesa's conversation [3]–in fact, the facts indicate that Viater could not have forced Mesa to even listen to, much less respond to, any particular line of questioning. The FBI therefore did not have the same power to wear down Mesa's will that the *Miranda* Court believed was present in a custodial setting. Until Mesa had surrendered, any attempt by the FBI to compel him to incriminate himself through either a display of power or the use of psychological tricks would have been extremely dangerous.

Law enforcement officials, when confronted with a situation such as the one in this case, do not have the same psychological advantage over the suspect that is present in "custodial interrogation" as described by the *Miranda* Court. The suspect may hold the police at bay by threatening to harm himself, any hostages he might have, or any of the officials outside his room. If he allows the police to establish a line of communication with him, as Mesa did in this case, he retains control over the timing and substance of these conversations. Although the police may have some

---

**3.** The *only* place in the entire three and one half hour taped conversation that Viater possibly could be said to have directed the conversation toward the shooting of January 28, is where he said to Mesa: "Tell me what happened yesterday. What was the provocation?" This statement immediately followed Mesa's statement: "What happened yesterday was a provocation. It was a provocation because I am not a criminal. I am not a criminal. Because I didn't hurt anybody until I went to Viet Nam." Because Viater's reference to the previous day's event came in direct response to Mesa's reference to the same event, we do not think that Viater can fairly be said to have directed the conversation toward that event.

psychological advantage by virtue of the fact that if the suspect chooses to leave the motel room he will be placed under arrest, the suspect in this situation, unlike the suspect in a custodial setting, retains the psychological advantage of being able to "call the shots" to some degree.

The custodial setting described by the *Miranda* Court was one in which the suspect was isolated in a police–dominated atmosphere where the police had immediate control over the suspect and thus could easily compel him to incriminate himself. Having barricaded himself inside the motel room with a gun, Mesa was not in such an atmosphere when he decided that he wanted to talk with Viater. I therefore conclude that Mesa was not in "custody" within the meaning of *Miranda*.

I do not retreat from this conclusion because the presence of law enforcement officials surrounding the motel restricted Mesa's freedom to leave the motel. The defendant argues that this fact establishes "custody" because *Miranda* requires warnings when the suspect is taken into custody or "otherwise deprived of his freedom by the authorities in any significant way." 384 U.S. at 478, 86 S.Ct. at 1630, 16 L.Ed.2d 694. The defendant further points out that subsequent cases have interpreted this language to focus on the suspect's freedom to leave. This broad language, however, as well as its interpretation in subsequent cases, must be read in conjunction with the *Miranda* Court's discussion of the custodial setting that formed the basis for the *Miranda* decision.

Supreme Court decisions after *Miranda* have relied on this broad language to determine whether the suspect was in "custody." *See Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam); *Orozco v. Texas*, 394 U.S. 325, 89

S.Ct. 1095, 22 L.Ed.2d 311 (1969). In these cases, the Court construed this language as focusing on the suspect's "freedom to come and go as he pleased." In *Orozco*, police officers interrogated the defendant in his bedroom at approximately 4:00 a. m. The Court held that, because the defendant "was not free to go where he pleased but was under arrest," 394 U.S. at 325, 89 S.Ct. at 1096, 22 L.Ed.2d 311, this was "custodial interrogation" despite the fact that it occurred at the defendant's home and not at the police station. In *Mathiason*, the Court held that the defendant had not been subjected to "custodial interrogation" even though he had been questioned at the police station for approximately one half hour. Although the defendant was interrogated while he was alone in the police station, the presence of other factors convinced the Court that he was not in "custody." He had come to the station voluntarily upon the police's request; he was told that he was not under arrest, that he was free to leave, and he actually left after the questioning. Therefore statements he made during this interrogation were admissible despite the absence of *Miranda* warnings.

The Court's focus in these cases on the suspect's freedom to come and go as he pleases must be considered in conjunction with the concerns underlying the custody requirement detailed above. The *Miranda* Court's description of the custodial setting demonstrates that, at a minimum, the police must have immediate control over the suspect. *Mathiason* and *Orozco* stand for the proposition that when the police have a suspect within their immediate control, the proper inquiry to determine whether he is in "custody" is not to ask if he was at the police station, but to ask if he was free to leave. My decision in this case is not inconsistent with this analysis.[4]

4. Nor is my position inconsistent with or intended to express any disapproval of our previous decision in *Steigler v. Anderson*, 496 F.2d 793 (3d Cir.), *cert. denied*, 419 U.S. 1002, 95 S.Ct. 320, 42 L.Ed.2d 277 (1974). In *Steigler*, we approved the reasoning of the United States Court of Appeals for the Second Circuit in *United States v. Hall*, 421 F.2d 540 (2d Cir.

1969), *cert. denied*, 397 U.S. 990, 90 S.Ct. 1123, 25 L.Ed.2d 398 (1970), in which that court concluded that interrogation was custodial if the police "would not have heeded a request to depart or [allowed] the suspect to do so." *Id.* at 545. In *Hall*, as in the Supreme Court cases discussed in text, the suspect was within the immediate control of the police, so the proper

In *Mathiason* and *Orozco*, each defendant was within the immediate control of the police when he was interrogated. The police could physically compel him to listen to their questions, or subject him to the psychological ploys that concerned the *Miranda* Court. The Court determined that *Miranda* warnings were not required in *Mathiason* but were required in *Orozco* because the defendant in the former case could come and go as he pleased while the defendant in the latter case could not. Once the police have immediate control over a suspect, if he cannot leave and thus avoid their control, then the potential for the intimidation of his will that concerned the *Miranda* Court is present–he is being interrogated in a police–dominated atmosphere. If, however, the police have not yet isolated the suspect in a police–dominated atmosphere where they have immediate control over him, the question whether he is free to leave need not be reached.

Because Mesa, by barricading himself in his motel room with a gun, successfully prevented the FBI from exercising any control over his immediate actions or forcing him to be subjected to their questioning, he was not in custody within the meaning of *Miranda.* I do not reach the inquiry whether he was free to leave because the FBI could not exercise the type of control over Mesa that the police did in *Orozco* and *Mathiason.* The fact that Mesa could not walk out of the motel room as a free man does not change this noncustodial situation into a custodial one.

To extend the *Miranda* rule beyond its rationale by requiring suppression in this case would place law enforcement officials in an extremely difficult position. In this case, the district court found, and I agree, that the FBI agents engaged in exemplary conduct. They managed to defuse a potentially dangerous situation without anyone

being hurt. Moreover, as soon as Mesa had surrendered and the FBI took him into custody, they read him his *Miranda* rights. Although I recognize that the purpose behind suppressing statements made during custodial interrogation without *Miranda* warnings is to protect the individual's fifth amendment rights and not to punish the police, extending *Miranda* to this situation would put law enforcement officials to a delicate and difficult choice. When confronted with an armed, barricaded suspect who is possibly holding hostages, their attention would be diverted from what should be their primary purpose–that of using the means most likely to convince the suspect to surrender peacefully without harming anyone in the area. They would be forced to consider the possibility that the suspect might make a statement that the government eventually would want to introduce at trial, and then they would have to assess whether he would be likely to react violently to the antagonistic–sounding *Miranda* warnings.[5] Unless warnings are needed to protect the suspect's fifth amendment privilege in this situation, I do not want to require law enforcement officials to make this difficult assessment or to discourage the type of conduct engaged in by the FBI in this case.

Furthermore, implicit in the *Miranda* holding is the notion that the police are in a position to give a suspect his warnings. In this situation, however, no one could suggest that Viater should have given Mesa *Miranda* warnings during their conversation. Viater needed to establish a relationship of trust with Mesa in order to convince him to surrender without harming himself or others. I think that the *Miranda* rule should be confined to those situations where the police have a fair choice in deciding whether to give the warnings. It should

inquiry becomes whether he is free to avoid their interrogation by departing.

5. The *Miranda* warnings are intended to "warn" a suspect that the police have interests that are antagonistic to his, and that they can use anything he says against him in court. This type of warning would be counterproduc-

tive to creating the atmosphere of trust that is necessary to convince a suspect like Mesa to surrender peacefully in this situation. If the FBI were to give the warnings in such a manner as to play down their antagonistic nature, their effectiveness as a warning to the suspect would be diluted to some degree.

not be expanded to encompass the present situation where the giving of warnings could have disastrous effects on the suspect and perhaps on others in the vicinity. Because this situation does not involve the type of custodial setting that concerned the *Miranda* Court, I conclude that the statements made by Mesa are not subject to objection on *Miranda* grounds.

However, I recognize that there may be situations in which it would be unfair to admit statements made by a suspect under the conditions present in this case. Therefore, I wish to emphasize that I do not conclude that all statements made by suspects when they have placed themselves in a situation such as Mesa's are automatically admissible. I conclude merely that *Miranda* warnings are not a required prerequisite to the admission into evidence of statements made by an armed suspect who has barricaded himself away from the police and thus is not within their immediate control. Of course, all statements must be voluntary before they can be admitted. *See Rogers v. Richmond*, 365 U.S. 534, 544, 81 S.Ct. 735, 741, 5 L.Ed.2d 760 (1961). If the police compel an armed, barricaded suspect to incriminate himself by psychological trickery or other police overreaching, the suspect can attack the admissibility of his statements on the ground that they were not voluntary, but compelled by the police in violation of his fifth amendment rights. As the Supreme Court recognized in *Beckwith v. United States*, 425 U.S. 341, 348, 96 S.Ct. 1612, 1617, 48 L.Ed.2d 1 (1976) (holding that *Miranda* warnings are not required in noncustodial interview even where the investigation had focused on the taxpayer), noncustodial interrogation might result in an involuntary confession. When deciding a voluntariness claim, a court must consider all the circumstances surrounding the incriminating statements, including the age and mental state of the suspect. *See, e. g., Gallegos v. Colorado*, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962); *Reck v. Pate*, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961). When a suspect places himself in a situation like that of Mesa in this case, any statements he makes should be closely scrutinized for voluntariness, but *Miranda* warnings are not a necessary prerequisite to the admission of those statements. Mesa has not claimed on this appeal that his statements to Viater were involuntary. Consequently, I do not reach this question. *Cf. Davis v. North Carolina*, 384 U.S. 737, 741–42, 86 S.Ct. 1761, 1764–65, 16 L.Ed.2d 895 (1966) (when claim is raised, appellate court must "examine the entire record and make an independent determination of the ultimate issue of voluntariness").

### III.

I conclude that where an armed suspect who possibly has hostages barricades himself away from the police, he is not in custody and therefore *Miranda* warnings need not be given as a prerequisite to the admission of his statements into evidence. Because a suspect who places himself in this position is not in "custody" within the meaning of the *Miranda* rule. I need not address the difficult issue whether Viater's conversation with Mesa constituted "interrogation" under such rule.

### IV.

The order of the district court suppressing the taped conversation will be reversed.

ADAMS, Circuit Judge, concurring.

I concur in the result reached by Chief Judge Seitz because, in my view, Mesa's statements were made in the course of a colloquy that is not an "interrogation," as that term was recently defined by the Supreme Court in *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

Several factors lead me to conclude that Agent Viater was not interrogating Mesa. Viater spoke with Mesa in an attempt to defuse an admittedly delicate and volatile situation, which presented a tangible danger of suicide or other violence. Mesa indicated that he wished to talk to the agent, because he was in need of a sympathetic listener to whom he could vent his confused and tortured mind. Viater acted not as a

questioner, but primarily as a listener. The conversation between Viater and Mesa was nonadversarial and noninquisitive in nature, and Viater's empathetic tone conveyed little of the subtle compulsion that characterizes police interrogation.[1] The concern expressed in *Miranda* that a defendant might be "subjugated to the will of the examiner" is not present here. See 384 U.S. 436, 457–58, 86 S.Ct. 1602, 1618–19, 16 L.Ed.2d 694 (1966). The comments interjected by the agent were not designed to elicit an incriminating response from Mesa, but were calculated to convey sympathy and understanding, to indicate that Viater was still listening, and to keep Mesa from dwelling on thoughts of suicide. The agent's prime motivation was to achieve a peaceful resolution of the confrontation, and it was only by talking to Mesa about his fears and recent events that Viater could hope to bring about this goal.[2] Indeed, when Viater asked Mesa to elaborate on his contention that he was provoked, he did so not to lure him into a confession, but to encourage him to continue expressing his concerns. This was necessary to allay Mesa's feeling that his life was over.

Moreover, it appears that Mesa's incriminating statements alluding to the shooting and his motivations for the act were made of his own volition. After indicating a desire to talk to someone so that he might be dissuaded from killing himself, Mesa proceeded to pour out his heart to Viater, virtually uninterrupted. The agent made few comments until several minutes into the monologue. When he did speak, his scant remarks were more in the nature of indications that he was listening than of coercive hints designed to channel the one–way conversation into incriminating admissions. In my view, the impression to be gleaned from the entire exchange between Mesa and Viater is of voluntary revelations made by an admittedly troubled person who had sought the opportunity to tell his story to a compassionate listener.

Admittedly, in light of the lower court's finding that Viater had a secondary purpose of gathering possible evidence, the question of whether Mesa was subjected to interrogation is an extremely close one. My conclusion that the statements are admissible is compelled by the realization that it would be impractical and counterproductive to require *Miranda* warnings to be given in such a sensitive situation fraught with a potential for tragedy. The success of a negotiating mission such as the one undertaken by Agent Viater is ultimately dependent on establishing an atmosphere of trust and understanding. It was crucial for Viater to convince Mesa that his aim was to provide help and a sympathetic ear. If the agent had been required to commence the conversation with the *Miranda* warnings, he would have created an adversarial atmosphere from the outset. The reading of the warnings would no doubt have eradicated any possibility for establishing trust and understanding. In attempting to negotiate the peaceful surrender of a suspect or hostages, law enforcement personnel should not be forced to make a pressured judgment as to whether reading the *Miranda* warnings would deter the suspect from talking, when it is the chance to engage the suspect in a dialogue that holds the main hope for saving lives. The delicacy of the position in which an agent might find himself is amply demonstrated by this case, where Mesa stressed that he would have killed himself if he had not talked to Viater.

Because I conclude that the exchange between Viater and the agent did not constitute an interrogation for the purpose of the *Miranda* rule, I do not find it necessary to address the difficult issue whether Mesa

---

1. In *Innis* the Court indicated that "interrogation," as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself. 446 U.S. at 301, 100 S.Ct. at 1690, 64 L.Ed.2d 297.

2. Although the *Innis* test is largely objective, the Court emphasized that the intentions of the police are relevant to the extent that practices or remarks that are not designed to elicit an incriminating response may not amount to "interrogation." 446 U.S. at 301, nn. 7 & 9, 100 S.Ct. at 1690 nn. 7 & 9, 64 L.Ed.2d 297.

was "in custody," although I concede that this is a proposition not free from doubt.[3]

One further word: Despite the sensitive law enforcement needs which militate against the use of *Miranda* warnings in a situation such as that presented here, I feel constrained to add the observation that the government may nevertheless deem it advisable to refrain from relying on these statements at trial. Just as reading the *Miranda* warnings may be counterproductive, a similar danger may be presented when statements obtained in trust and confidence are later used against the accused. In light of the necessity of creating an atmosphere conducive to encouraging the suspect to talk to the agents, and the repeated assurances given here that Viater was a friend seeking to help, and a person whom Mesa could trust completely, the use of these statements may undermine the trust that is so crucial to the success of surrender–negotiation missions. Once alerted to the possibility that the government may abuse or breach the trust by not adhering to its assurances of aid and friendship, suspects may be more reluctant to negotiate with the police. The final judgment, however, regarding the fairness or desirability of recording and introducing statements obtained in situations such as the present one is, I believe, a policy decision for the executive branch.

WEINER, District Judge, dissenting.

I

Rigoberto Mesa has been charged with two counts each of assault with intent to commit murder, assault with a dangerous weapon, and assault resulting in serious bodily injury, in violation of 18 U.S.C. § 113(a), (c) and (f). After entering a plea of not guilty to all counts, Mesa moved the District Court to suppress statements made by him in the absence of the warnings required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

This appeal is from an opinion and order of the District Court [1] excluding from introduction into evidence as part of the government's case–in–chief statements made by Mesa during a tape recorded conversation between himself and FBI Agent Theodore Viater. The District Court found that Mesa was in custody and was interrogated by Agent Viater, and that *Miranda* warnings were therefore required if the statements were to be admissible as part of the government's case–in–chief.

Because I agree with the District Court that Mesa was subject to custodial interrogation and differ with Chief Judge Seitz's conclusion that Mesa was not in custody for purposes of a *Miranda* warning while barricaded in his motel room and surrounded by federal, military, and local law enforcement officers, and with the conclusion of Judge Adams that no interrogation took place, I would affirm the District Court's order and must therefore respectfully dissent.

II

On January 28, 1980, Karin Little, Mesa's "common–law" wife, and Sonia Mesa, his daughter, were shot and wounded. That same day the FBI learned from the victims

---

**3.** It has been suggested that we are precluded from re-examining whether Mesa was subjected to custodial interrogation inasmuch as this is a factual determination within the province of the trial court. Such a proposition, however, would appear to be based on a fundamental misconstruction of the nature of the inquiry in *Miranda* cases. "Custodial interrogation" is a legal term of art central to *Miranda* jurisprudence, and a decision whether or not "custodial interrogation" occurred is a matter of law to be determined in accordance with the policies underlying the *Miranda* rule. The legal nature of the determination is evidenced by the numerous Supreme Court decisions deciding whether certain facts constitute "custody" or "interrogation." See, e.g., *Rhode Island v. Innis,* 48 U.S.L.W. 4506 (May 12, 1980); *Oregon v. Mathiason,* 429 U.S. 492 (1977); *Orozco v. Texas,* 394 U.S. 325 (1965). Accordingly, an appellate court is free to re-examine the trial court's legal conclusion as to the applicability of the *Miranda* rule. The standard of appellate review does not change simply because the legal determination in a *Miranda* situation depends on the particular facts of each case.

**1.** *United States v. Mesa,* 487 F.Supp. 562 (D.N. J.1980).

that their injuries were inflicted by Mesa. After an unsuccessful search for Mesa on the 28th, a complaint was filed on January 29th, before a United States Magistrate, who issued a warrant for Mesa's arrest.

At approximately 2:00 p. m. on January 29th, three FBI agents went to the El Sombrero Motel in Browns Mills, New Jersey in an attempt to locate Mesa. The agents were informed that Mesa had barricaded himself in his room sometime before 10:00 a. m. that day. The agents evacuated the surrounding rooms, barricaded the adjoining area and blockaded the streets.

The agents parked their car directly in front of Mesa's room and using a bullhorn called out to Mesa that they were FBI, that they had a warrant for his arrest, and that he should come out with his hands raised. There was no response from Mesa. This statement was repeated over the bullhorn more than ten times during the first hour of the confrontation, but Mesa did not surrender.

Other law enforcement authorities were notified of the situation and within twenty minutes nearly thirty federal, state, and military law enforcement officials were on the scene. In addition, during the course of the confrontation close to 200 members of the press, including radio and television reporters, were present outside the motel.

The agents requested the assistance of the FBI Special Agent Theodore Viater, who was specially trained in hostage negoti-

ation. The agents at that time did not know whether Mesa had any hostages or what weapons he might have. In fact, Mesa had no hostages but did have a pistol.

Before Agent Viater's arrival at 3:00 p. m., Mesa had passed three notes through the door to the agents outside. The notes indicate that Mesa was confused, was hearing an inner voice, and wanted to see a psychiatrist, but would give himself up, and would not hurt anyone, although he needed more time.[2]

The motel room did not have a telephone, so it was necessary to use a mobile telephone in order for Viatar to talk with Mesa. Using hand signals, Mesa agreed to take such a telephone into the room.

Agent Viater spoke with Mesa over the phone for the next few hours. All but the initial five percent of the conversation was tape recorded. Agent Viater testified that the unrecorded portion consisted of Viater identifying himself as an FBI agent and hostage negotiater who was there to help Mesa.

The conversation ranged over various events in Mesa's life, including his relationship with his family, his experiences in Vietnam, and the events of the previous day. As the trial judge noted,[3] Viater lent a sympathetic ear to Mesa's tale of troubles, and attempted to establish an atmosphere of trust between himself and Mesa. The Judge quite correctly concluded that an atmosphere of mutual trust was created.[4]

---

2. Note one (Exhibit D–1): "Have a little patience. I will give myself up. My mind is too confused. I won't hurt anybody so wait till dark and call the M.P. I give you my words I really need to see a psychiatrist. To many people. Please tonight and will come out only to the M.P."

Note two (Exhibit D–2): "If I say I have a gun you will storm the place. I said I don't want to hurt anybody. If you really know what I have been through this inner voice what don't let me alone.

I have been done everything. I am not a criminal but please give me a little more time. Your wife will be impatient. At least you have someone to come. I never have that. I try so hard to make so good."

Note three (Exhibit D–3): "The guy that pick up my note, please tell him that if I want to

hurt him I got the chance twice so if he bring the phone act like a man. I am not a criminal."

3. 487 F.Supp. at 564–65.

4. The following statements made by Agent Viater while talking with Mesa are representative:
   Yes, Rigoberto, I am listening to you very intently. I can, I have empathy for what you're saying. I understand exactly the things you are expressing to me. And I want you to know I understand and be aware of the fact that I am here to help you. Are you, are you aware of that?
   I'm concerned about you Rigoberto, I'm concerned about your welfare, and I'm concerned about your health and I want to make absolutely certain that you and I trust each other and we can bring this problem to a successful solution.

At various times throughout the conversation Agent Viater directed questions about the previous day to Mesa, and encouraged him to talk freely about those events.[5] Viater testified that his purpose during the confrontation was to defuse the volatile situation and prevent any harm befalling Mesa or any of the law enforcement officials in the area. The District Court concluded, and I agree, that Viater had a secondary purpose of gathering information about Mesa's involvement in the shootings of his ".common–law" wife and daughter.

Mesa surrendered peacefully at 6:30 p. m. He was thankful that Agent Viater had spoken with him, and told Viater that he would have killed himself if they had not talked.

At no time during the conversation was Mesa advised of his *Miranda* rights, although a *Miranda* warning was given to him after his surrender.

### III

The heart of the *Miranda* rule is that, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self–incrimination." *Miranda v. Arizona,* 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d 694. Thus, the Supreme Court's requirement that a suspect:

> be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

Custodial interrogation was defined by the Supreme Court in *Miranda* as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his free-

dom of action in any significant way." *Id.* at 444, 86 S.Ct. at 1612; *quoted in Oregon v. Mathiason,* 429 U.S. 492, 494, 97 S.Ct. 711, 713, 50 L.Ed.2d 714 (1977).

The initial question to be considered is whether Mesa was "in custody or otherwise deprived of his freedom of action" during the conversation with Agent Viater.

In articulating the availability and scope of the Fifth Amendment's privilege against self–incrimination, the Court in *Miranda* sought to "protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves." *Id.* at 467, 86 S.Ct. at 1624. The Court recognized the "inherently compelling pressures" present during in–custody interrogation, and the need for proper safeguards in order to combat these pressures which operate to compel a suspect to speak "where he would not otherwise do so freely." *Id.*

The Court clearly intended that the rule it was so forcefully establishing would not be limited to situations involving actual station–house custody. Rather, the Court contemplated the reach of the Fifth Amendment's protection to include a person "otherwise deprived of his freedom of action in any significant way." Thus, in *Orozco v. Texas,* 394 U.S. 325, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969), the Court held that *Miranda* applied to a person interrogated in his own bedroom who was not free to come and go as he pleased but was under arrest, as such interrogation was custodial. Moreover, the Court in *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) made it clear that it is not the particular setting itself in which the questioning takes place that defines an interrogation as custodial, but rather the restraint on the interrogated person's freedom of movement that creates the coercive environment that renders that person in custody for *Miranda* purposes.

---

**5.** The following exchange is illustrative:

Viater: Tell me what happened Rigoberto?
Mesa: What happened what?

Viater: Tell me what happened yesterday. What was the provocation?

Judge Seitz reviews the *Miranda* decision, and focuses as did the Supreme Court, on the psychological pressures to which a person interrogated in private in a police dominated atmosphere is subject. Judge Seitz distinguishes the case *sub judice* from *Miranda*, however, with an analysis in which I cannot join. Apparently it is the lack of "immediate" police control over Mesa stemming from the fact that no officers were actually present in the motel room with Mesa that is of crucial significance to Judge Seitz. In the view of Judge Seitz, Mesa could therefore not be handcuffed, nor could questioning be forced upon him, nor could the content and direction of the conversation be controlled by the authorities. Thus, Judge Seitz concludes, Mesa was not in a police dominated atmosphere subject to the psychological advantages possessed by law enforcement officers in a custodial setting.

I find the distinctions drawn by Judge Seitz to be at odds with my view. It appears to me that Mesa was indeed deprived of his freedom of action by the time Agent Viater initiated the telephone conversation with him. Mesa was alone, and locked inside of a room in a motel with only one exit. The motel was surrounded by twenty or more law enforcement officers led by FBI agents armed with a warrant for Mesa's arrest. The surrounding rooms had been emptied, the adjoining area barricaded, and the streets blockaded. An FBI car was parked directly in front of the motel room. Mesa's only communications link with the world outside the room was the mobile telephone, which provided a direct connection with the authorities surrounding the room.

Contributing to the seige atmosphere at the scene was the presence of scores of radio and television reporters and other members of the press. Despite their presence, Mesa was isolated in his room and in communication only with law enforcement officers speaking over a mobile telephone. In a very real sense therefore, he was under the direct and immediate control of the authorities and was effectively being restrained by them in his freedom of movement. As the District Court so bluntly stated, Mesa could have left the room in only one of three possible ways: dead, injured and under arrest, or uninjured and under arrest.[6] It is thus of little import that Mesa was not actually placed under arrest until his surrender. This court has previously held that:

> ... in the absence of actual arrest something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so.

*Steigler v. Anderson*, 496 F.2d 793, 799 (3d Cir. 1974), *quoting United States v. Hall*, 421 F.2d 540, 545 (2d Cir. 1969), *cert. denied*, 397 U.S. 990, 90 S.Ct. 1123, 25 L.Ed.2d 398 (1970). To say that Mesa would have been allowed to freely leave the motel room, or that he was not deprived of his freedom of movement is to severely misinterpret the actions and intentions as well as to grossly underestimate the strength of the law enforcement authorities on the scene, and the magnitude of Mesa's predicament.

Furthermore, Mesa was not appreciably less restricted in his freedom of action than he would have been had Agent Viater or another officer been in the motel room with him, or had he been actually under arrest. Actual physical presence of an officer, or being placed under arrest, might have served to *increase the already existing* psychological pressure on Mesa as well as the control over him exerted by the officers surrounding the motel, but the lack of such arrest or actual presence of officers inside the room did not significantly diminish the immediateness and directness of the pressure and control which was in fact exerted by the officers.

It is thus evident to me that the situation at the motel was replete with the very same dangers to Mesa's Fifth Amendment rights as are present in a station–house custody situation. Indeed, the need for the protec-

6.  487 F.Supp. at 566.

tion of a *Miranda* warning in order to safeguard Mesa's right against self-incrimination may even have been more acute here than it would have been in the more ordinary custodial setting of a police station. Mesa was in a particularly vulnerable position with respect to his Fifth Amendment rights because of his mental condition and the relationship of trust which Agent Viater was able to establish with him. Mesa was confused, frightened, and depressed, and repeatedly voiced concern for his safety. Throughout the conversation Agent Viater reassured Mesa that he was Mesa's friend, and that Mesa should trust him and speak freely to him.

Furthermore, Judge Seitz ascribes undue importance to what he considers to be Mesa's ability to control the conversation with the agent. While it is true that a person barricaded in a motel room with a gun retains some ability to "call the shots", the overall "balance of power" that existed at the motel scene was with the authorities surrounding the motel, who were clearly in command of the situation. In addition, any suspect being questioned in a police station or other custodial setting has a similar ability to terminate a conversation with law enforcement officers by simply refusing to speak to his interrogators. The purpose of the *Miranda* warning though is that unless apprised of his constitutional rights, a person being interrogated while in custody or "otherwise deprived of his freedom of action" may not be aware that he has such rights. The mere ability to terminate questioning by the authorities does not abrogate one's rights under the Fifth Amendment and the *Miranda* rule; rather it is the need to assure that those who in fact possess Fifth Amendment rights are actually informed of their right and ability to exercise them that gives rise to the required safeguards of the *Miranda* rule.

## IV

Having recognized that Mesa's statements were made while he was deprived of his freedom of action and confined within a coercive custodial environment, the remaining issue to be decided is whether the conversation between Agent Viater and Mesa constituted an interrogation.

The meaning of interrogation was recently addressed by the Supreme Court in *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980):

> We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

(footnotes omitted).

At the outset, it is not necessary to engage in any lengthy discussion of whether Agent Viater's statements were in fact "questions", for his words and actions surely were the functional equivalent of express questioning, and as such fall squarely within the Supreme Court's definition of interrogation. Although the Supreme Court has provided only little guidance as to precisely what constitutes the functional equivalent of express questioning, any meaningful definition of the term would have to encompass the situation presented here.

The Supreme Court in *Innis* has indicated that the *intent* of the police:

> . . . may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response. In particular, where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect.

*Id.* at 302 n.7, 100 S.Ct. at 1690 n.7.

In the case *sub judice*, Agent Viater had the secondary purpose of obtaining information from Mesa about the previous day's

shootings.[7] Agent Viater did quite a bit more than exchange mere pleasantries with Mesa. His comments were frequently investigatory and can hardly be described as innocuous in terms of their interrogatory character and their effect upon Mesa. Viater's comments appear calculated to both bring about a peaceful end to the standoff at the motel and to elicit information about the shootings. The agent not only listened patiently to Mesa's often rambling monologue, but also attempted to direct the course of the conversation.

The Court further explained its definition of interrogation by stating that:

> ... [a]ny knowledge the police may have concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor in determining whether the police should have known that their words or actions were reasonably likely to elicit an incriminating response from the suspect.

*Id.* at 302 n.8, 100 S.Ct. at 1690 n.8.

Agent Viater had assured Mesa of his concern for him, and had encouraged him to speak freely. An atmosphere of trust was established, which coupled with Mesa's fear and confusion, increased his susceptibility to the particular form of persuasion employed by the agent. Agent Viater was a trained negotiator, who no doubt was well aware of exactly what he was saying and doing and of the likely effect which his words and actions would have upon Mesa. Consequently, the probable result of the conversation and questioning could not have been unknown to him.

Accordingly, Agent Viater certainly should have known that questions concerning the shootings were reasonably likely to elicit an incriminating response from Mesa. In fact, it seems inconceivable that Viater could not have known that the entire conversation itself, as well as the specific questions relating to the shootings, would be reasonably likely to elicit an incriminating response.

Moreover, Agent Viater did in fact direct express questions to Mesa about the shooting of Mesa's "common–law" wife and daughter.[8] There can thus be no question but that Mesa was subject to an interrogation within the meaning of *Innis.*[9]

I am unable to agree with Judge Adams' characterization of the conversation as non–adversarial and non–inquisitive. In Judge Adams' view, Agent Viater's "empathetic tone conveyed little of the subtle compulsion that characterizes police interrogation" and "his comments were not designed to elicit an incriminating response but rather were calculated to convey sympathy and understanding." This conclusion is apparently based on what Judge Adams describes as Mesa's "need for a sympathetic listener to whom he could vent his confused and tortured mind."

I am not quite as inclined to adopt so benign an interpretation of the conversation between Mesa and Agent Viater, especially in light of the District Court's finding, with which I agree, that Viater had a secondary purpose of gathering information about Mesa's involvement in the previous day's shootings. To the contrary, it is precisely because Mesa's mind was confused and tortured and because Viater's empathetic tone did convey sympathy and understanding that Mesa was in a vulnerable position with respect to the interrogatory aspects of the conversation. Rather than evidencing an absence of interrogation, Agent Viater's tone contributed to the "unusual susceptibility" of Mesa to this "particular form of persuasion." It must be remembered that Viater's primary role was not merely one of sympathetic counselor,

---

**7.** See footnote 5, *supra,* and accompanying text.

**8.** See footnote 5, *supra.*

**9.** This conclusion is not inconsistent with the result in *Innis,* for the Supreme Court there found nothing to suggest that the police were aware of any peculiar susceptibility on the part of the accused, or that the accused was unusually disoriented or upset, or that the officers' remarks were designed to elicit a response. *Id.* at 303, 100 S.Ct. at 1690. By contrast, all of these factors are present in the case *sub judice.*

but rather that of a trained law enforcement officer.

Judge Adams also ascribes what I believe to be undue importance to his conclusion that Mesa's statements, in which he "poured out his heart to Viater," were made of his own volition. *Miranda* and its progeny are addressed not to the voluntariness per se of an accused's statements, but to the inherently coercive atmosphere of a custodial interrogation, with its attendant Fifth Amendment implications. If a statement is made during a custodial interrogation and without the benefit of a *Miranda* warning, it need not be characterized as "involuntary" in order for there to be a *Miranda* rule violation.

## V

Any criticism of Agent Viater's performance during the crisis at the motel is completely without justification. Confronted with a potentially explosive situation in which he and his fellow agents were placed in danger of their lives, he succeeded in arranging for Mesa's peaceful surrender. Agent Viater and the FBI deserve all due admiration and respect for their exemplary conduct, and it is not my intention to second guess skilled law enforcement officers trained to handle dangerous situations. But no matter how laudable the agent's success in achieving his stated goal of safely defusing a volatile situation, it would be impermissible to allow the government in its case–in–chief to introduce Mesa's statements into evidence. The conversation occurred while Mesa was custodially confined in a coercive environment, and the statements were made by him in response to the FBI agent's interrogation. So long as this custodial interrogation took place without the benefit of a *Miranda* warning, protection of Mesa's Fifth Amendment rights must be the court's concern.

Officers engaged in the delicate art of negotiation with an armed, barricaded suspect are admittedly placed in a difficult position. No one can doubt that the officers' primary responsibility in such an event must be to defuse the situation as peacefully and safely as possible. Yet the Fifth Amendment compels a court to protect the precious rights guaranteed to an accused and to reject the government's attempt to introduce an accused's statements made during a custodial interrogation without the benefit of the required *Miranda* warning.

Accordingly, I would affirm the District Court's order suppressing the taped conversation.

GIBBONS, Circuit Judge, dissenting from the denial of a petition for rehearing in banc.

The defendant Rigoberto Raciel Mesa petitions for rehearing in banc of a judgment of a panel of the court reversing an order of the district court which had ordered suppression of a statement because it had been obtained in circumstances violating the rule of *Miranda v. Arizona,* 348 U.S. 436 (1966). The case was before the panel on the government's appeal pursuant to 18 U.S.C. § 3731 (1976). There is no opinion of the court. Chief Judge Seitz justified the judgment reversing the suppression order on the factual conclusion that Mesa was not in custody at the time of the interrogation. Judge Adams, expressing doubts as to the validity of Chief Judge Seitz's factual conclusion as to custody, justified the reversal on the factual conclusion that assuming custody no interrogation had taken place. Judge Weiner dissented.[1] He would have held that both on the custody question and on the interrogation question the findings of fact of the trial court were not clearly erroneous, and would have affirmed the suppression order. I dissent from the denial of the petition for rehearing for three reasons.

First, I am at a loss to understand the legal justification for either of the judges joining in the panel majority in support of the judgment substituting their findings of

---

1. Hon. Charles R. Weiner, United States District Judge for the Eastern District of Pennsyl- vania, sitting by designation.

fact for those made by the trial court in the hearing on the suppression motion. Their actions in this respect are an instance of appellate disregard of the normal standards of appellate review. I do not think that approach to the task of appellate judging bodes well for the respect for the appellate process by district judges whose work we review, by litigants, or by the public. Undoubtedly all three of those constituencies will conclude, as I do, that had the district court made contrary findings on the critical issues of custody and interrogation the normal deference would have been paid to its findings of fact.

Second, from an institutional standpoint it is fundamentally wrong to let stand a pre-trial judgment reversing a suppression order when two judges cannot agree on a rationale for that judgment. Because this case is before us on an interlocutory appeal by the government, it must go back for trial. If Mesa is convicted he will be the appellant the next time, and he will be asserting the same objection to the admission of his statement. If the panel which considers that appeal concludes that the district court's findings of fact were not clearly erroneous, or if further evidence relating to the circumstances of the interrogation are developed at trial, it will be faced with a determination of the effect to be given to the prior appellate judgment. In my view, the next panel must, as a matter of due pocess, be free to reconsider the suppression question. An interlocutory judgment not supported by a rationale in which at least two judges concur certainly cannot be treated as law of the case. It announces *no* law that can bind the rest of the court. Even the government cannot safely rely on the judgment. It runs the risk that if the statement is admitted a conviction will be reversed. But whether or not a majority of this court agrees with me on the future effect of the interlocutory decision, I am completely mystified as to the reasons why, institutionally, a majority of the court would be willing to leave the case in a posture in which the question can even arise. As with the issue of appellate fact finding, I am concerned with the effect on our institutional image of leaving the case in that posture.

Finally, addressing the unique facts of the case, I note that the interrogation, if that is what it was, took place when Mesa was armed, barricaded in a motel room. The interrogator was an agent of the Federal Bureau of Investigation seeking, by psychological means, to persuade him to surrender without resort to violence. Like the three panel members, I agree that the agent's motives were primarily humanitarian. I also agree that the formality of giving *Miranda* warnings might in those circumstances be counterproductive of the psychological results sought to be achieved. But Chief Judge Seitz and Judge Adams both make the logical error of assuming that an affirmance would somehow require the police to give *Miranda* warnings in the situation described. There is another possibility, which in their discomfort with the *Miranda* rule they chose to ignore. The police, recognizing the humane concerns which suggest talking to a barricaded and unstable gunman in an effort to persuade him to surrender, could simply decide, as they probably did here, that it was better to withhold the *Miranda* warnings and do without the evidence obtained during the conversation. After all, they would not have had that evidence if they broke into the room and shot Mesa. Thus the opinions supporting the judgment on different theories both are predicated upon a false premise.

I would grant rehearing in banc, and would affirm the trial court's suppression motion.